**In re William M. JONES and Janet A. Jones, a/k/a Janet L. Allen, Debtors.**

**No. 8:04–BK–11770PMG.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Oct. 14, 2005.

Charles H. Dittmar, Jr., Law Office of Charles H. Dittmar Jr., Tampa, FL, for Debtors.

**ORDER ON UNITED STATES TRUSTEE'S MOTION TO DISMISS PURSUANT TO 11 U.S.C. § 707(b), OR ALTERNATIVELY, 11 U.S.C. § 707(a)**

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing to consider the Motion to Dismiss Pursuant to 11 U.S.C. § 707(b), or Alternatively, 11 U.S.C. § 707(a). The Motion was filed by the United States Trustee.

In the Motion, the United States Trustee (the UST) asserts that the Debtors, William and Janet Jones, own real and personal property of substantial value, and receive net income of more than $6,000.00 per month. The UST further asserts that the Debtors would be able to fund a plan under Chapter 13 of the Bankruptcy Code if certain unnecessary expenses were eliminated from their budget.

For these reasons, and because the UST contends that other indicia of bad faith are present in this case, the UST seeks the entry of an Order dismissing the Debtors' bankruptcy case as a "substantial abuse" of the provisions of Chapter 7 within the meaning of § 707(b) of the Bankruptcy Code. The UST also seeks a dismissal of the case for "cause" pursuant to § 707(a) of the Bankruptcy Code.

In response, the Debtors assert that their financial difficulties are the result of events that were not foreseen by them at the time that most of their obligations were incurred. The Debtors further assert that the realities of their budget do not permit them to fund a Chapter 13 plan. Consequently, the Debtors contend that they are properly entitled to the relief provided by Chapter 7 of the Bankruptcy Code.

**Background**

The Debtors resided in New York prior to 2001.

The Debtor, William Jones, has been employed by JPMorganChase or its predecessor for more than twenty years. William Jones received a transfer of his em-

ployment from New York in 2001, and the Debtors moved to Florida in July of that year. William Jones is presently a financial manager at JPMorganChase.

The Debtor, Janet Jones, left her employment in New York when the Debtors moved to Florida, and is currently employed as a financial analyst for the Tampa Housing Authority.

In connection with their relocation to Florida, the Debtors sold their home in New York and received net proceeds from the sale in the approximate amount of $120,000.00.

In March of 2001, while the Debtors were planning their move, they entered into a contract with MacRiley Homes for the construction and purchase of a home in Brandon, Florida. The contract price was approximately $330,000.00. (Transcript, Vol.I, p. 25). The Debtors paid MacRiley Homes a deposit in the amount of $62,400.00 for the construction and purchase of the home.

MacRiley Homes subsequently discontinued its business operations without constructing the home. The Debtors hired an attorney, David Stamps, Esquire, to pursue their remedies against the builder, but no portion of their deposit was ever recovered. (UST's Exhibit 16).

In early 2002, after MacRiley defaulted on its contract, the Debtors entered into a new contract to construct and purchase a different home located at 10520 Bermuda Isle Drive in Tampa, Florida. The Bermuda Isle Drive home, where the Debtors currently reside, consists of approximately 3,650 square feet of living space, plus a pool and three-car garage. The purchase price for the home was $385,000.00. (Transcript, Vol.I, pp. 27–28).

In order to pay for the home, the Debtors withdrew the sum of $217,000.00 from William Jones' 401(k) account. Of the to-tal amount withdrawn, the Debtors used the sum of $185,000.00 as a partial cash payment for the Bermuda Isle Drive home.

The Debtors applied for a mortgage to finance the remainder of the purchase price for the home. At the time that they applied for the mortgage, they were informed that a large balance existed on certain credit card accounts in William Jones' name. (Transcript, Vol.I, p. 32). Although the credit cards were issued in William Jones' name, the cards were actually used by Darryl Newman, a friend of the Debtor's, with the Debtor's permission. According to the Debtor, the mortgage was approved only after he furnished proof to the mortgage company that Darryl Newman was making payments on the accounts. (Transcript, Vol.I, p. 32).

The closing on the purchase of the home occurred in December of 2002.

The Debtors signed their Income Tax Return for the 2002 tax year on August 14, 2003. The return reflects a total tax for the 2002 tax year of $120,361.51, less payments made in the amount of $24,996.83, for a remaining tax due of $95,364.68. A significant portion of the tax is attributable to the Debtors' withdrawal of funds from the 401(k) plan. (UST's Exhibit 3).

The Debtor, William Jones, initially met with his bankruptcy attorney in early March of 2004. (Transcript, Vol.I, pp. 34, 69).

Also in March of 2004, the Debtors reached an agreement with the Internal Revenue Service regarding their 2002 income tax liability. Essentially, it appears that the Debtors agreed to make an immediate lump sum payment to reduce the total liability, and then to commence an installment arrangement to satisfy the balance of the debt.

To implement the agreement, the Debtor, Janet Jones, charged a cash advance of $12,000.00 on her Chase Visa account, and a cash advance of $15,000.00 on her Sears account, in mid to late March of 2004. (Transcript, Vol.I, pp. 73–75). Of the $27,000.00 obtained from the credit card accounts, the Debtors immediately paid the sum of $24,000.00 to the Internal Revenue Service. After the total tax liability was thereby reduced, the Debtors then made monthly payments to the Internal Revenue Service in April, May, June, and July of 2004. (Transcript, Vol.II, p. 18).

The Debtors filed their petition under Chapter 7 of the Bankruptcy Code on June 9, 2004.

On their schedule of assets filed in the case, the Debtors listed their homestead real property located on Bermuda Isle Drive in Tampa. The Debtors claimed that the value of the home was $400,00.00, and that the home was encumbered by a mortgage in the amount of $188,000.00.

On their schedule of personal property, the Debtors listed assets with a total value of $185,860.50. The personal property primarily consists of William Jones' retirement account with JPMorganChase in the amount of $108,000.00, William Jones' 401(k) account with JPMorganChase in the amount of $34,000.00, Janet Jones' retirement account in the amount of $5,000.00, a 2003 Chevrolet Impala with a value of $12,000.00, and a 2004 Ford Explorer with a value of $23,000.00. The two vehicles and the 401(k) account are encumbered by liens.

On their schedule of creditors holding priority claims, the Debtors listed the claim asserted by the Internal Revenue Service in the amount of $22,000.00.

On their schedule of general unsecured claims, the Debtors listed fourteen creditors holding unsecured claims in the total amount of $149,965.00. Of the total unsecured debt, five of the claimants, including Chase Visa ($13,200.00) and Sears ($14,300.00), are designated as creditors of Janet Jones. The other nine claimants, with claims totaling $77,365.00, are designated as creditors of William Jones. William Jones testified that "most" of the unsecured debt in his name was incurred by Darryl Newman. (Transcript, Vol.I, p. 19).

On their original schedule of income and expenses, the Debtors listed combined net income in the total amount of $6,775.00 per month, and total expenses for their household in the amount of $6,700.00 per month. The expenses include the Debtors' monthly mortgage payment of $2,675.00.

The Debtors filed an amended schedule of expenses on October 1, 2004.

On May 20, 2005, the Debtors further amended their schedule of expenses, and also filed an amended schedule of income. The amended schedule of income reflects combined net income of $7,418.00 per month. The second amended schedule of expenses reflects total household expenses of $7,305.00 per month.

### Discussion

In the Motion to Dismiss, the UST asserts that the Debtors would be able to fund a Chapter 13 plan if they eliminated certain expenses from their budget that are not reasonably necessary for their support or maintenance. In other words, the UST contends that "the Debtors filed this Chapter 7 case simply to maintain a lifestyle of their own choosing at the expense of their creditors." (Doc. 5, p. 4). Consequently, the UST requests that the Court dismiss this case pursuant to § 707(a) or § 707(b) of the Bankruptcy Code.

### I.  Section 707(b)

Section 707(b) of the Bankruptcy Code provides in part:

**11 USC § 707. Dismissal**

■ (b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts *if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter.* There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(Emphasis supplied). The United States Trustee has the burden of proving that a chapter 7 case should be dismissed under § 707(b). *In re Cox,* 249 B.R. 29, 31 (Bankr.N.D.Fla.2000).

In evaluating motions to dismiss under § 707(b), courts in the Eleventh Circuit generally agree that the outcome should depend on the "totality of the circumstances." "In the absence of controlling Eleventh Circuit authority, bankruptcy courts in this District have examined the 'totality of the circumstances' to determine whether to dismiss a case for 'substantial abuse.' " *In re Meyn,* 330 B.R. 286, 288–89 (Bankr.M.D.Fla.2005)

Courts also agree, however, that the primary factor in the analysis is whether the debtor has the ability to repay even a portion of his liabilities pursuant to a hypothetical chapter 13 plan. *In re Meyn,* 330 B.R. 286, 288–90; *In re Leung,* 311 B.R. 626, 630–31 (Bankr.S.D.Fla.2004); *In re Brown,* 301 B.R. 607, 611 (Bankr.M.D.Fla. 2003)("A debtor's ability to pay as measured by what he could pay in a hypothetical Chapter 13 case is the primary but not conclusive factor in determining whether there is a substantial abuse of Chapter 7.").

**A. Ability to pay**

■ A debtor's ability to repay a portion of his debts is the primary factor in determining whether a case represents a "substantial abuse" of Chapter 7.

**1. Income**

■ To determine whether a debtor is able to pay a significant portion of his debts, it is necessary to consider the amount of the "disposable income" that would be available for such repayment. *In re Shields,* 322 B.R. 894, 897 (Bankr.M.D.Fla.2005)(citing *In re Pier,* 310 B.R. 347, 353 (Bankr.N.D.Ohio 2004)).

■ As set forth above, for example, a debtor's "ability to pay" is generally measured by calculating the income that the debtor would be required to commit to a plan in a hypothetical Chapter 13 case. Pursuant to § 1325(b) of the Bankruptcy Code, a Chapter 13 debtor's plan may be confirmed over an objection, if the debtor dedicates all of his "projected disposable income" to the plan. 11 U.S.C. § 1325(b)(1)(B). "Disposable income" is defined as "income which is received by the debtor and which is not reasonably necessary to be expended—(A) for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2).

A threshold issue in this case, therefore, is whether the Debtors receive income that exceeds what they need for their maintenance or support, so that they would be able to repay a portion of their debts through a hypothetical Chapter 13 plan.

■ In their Amended Schedule I filed on May 20, 2005, the Debtors stated that their combined net income is $7,418.00 per month. (Doc. 27; UST's Exhibit 1). To calculate their net income, the Debtors subtracted certain amounts from their gross income as "payroll deductions." The

payroll deductions include the sum of $948.00 for repayment of the 401(k) loan that they obtained in 2002, and the sum of $200.00 for 401(k) contributions.

The Debtors contend that the loan repayment is a necessary deduction from William Jones' gross income because such repayment is required by his employer, and also because nonpayment of the loan would result in an additional tax liability. Although the Court is sensitive to the consequences of a default in payment, prevailing authority under § 707(b) holds that the funds should be regarded as income that is available in a hypothetical Chapter 13 case.

The payroll deductions related to the 401(k) plan are not appropriate deductions for purposes of computing the Debtors' disposable income under § 707(b).

> Contributions a debtor makes to his 401(k) plan do not constitute funds necessary for support and, therefore, must be included in disposable income for the purpose of deciding the issue of substantial abuse.... The repayment of a loan from a 401(k) plan also must be included in disposable income. (Citation omitted). When a person borrows from his own retirement account, it does not create a true loan, as it does not create a debt to a third party. (Citation omitted). A 401(k) loan is a loan from oneself to oneself. "[T]here is no meaningful difference between 401(k) loan repayment and contribution." (Citation omitted). There is an inherent unfairness in permitting a debtor to pay himself by funding his own retirement account while paying creditors only a fraction of their just claims.

*In re Keating,* 298 B.R. 104, 110–11 (Bankr.E.D.Mich.2003). *Keating's* rationale appears especially pertinent in this case, where the proceeds of the 401(k) loan were used primarily to purchase the Debtor's homestead, and were not used to pay other creditors. *In re Vansickel,* 309 B.R. 189, 210 (Bankr.E.D.Va.2004). See also *In re Collins,* 2004 WL 3510107, at *4 (M.D.N.C.)(401(k) contributions and payments on a 401(k) loan "are not reasonably necessary for the support and maintenance of a debtor or dependents of a debtor and in the context of a § 707(b) determination should be treated as disposable, available income for purposes of evaluating whether the debtor has the ability to repay her creditors.")

The Debtors' 401(k) contribution and 401(k) loan repayment should not be deducted from the Debtors' gross income for purposes of determining their disposable income.

The Debtors' combined net income therefore equals at least $8,566.00 per month. ($7,418.00 + $948.00 + $200.00 = $8,566.00).

On their amended Schedule J filed on May 20, 2005, the Debtors stated that their expenses equal the sum of $7,305.00 per month.

Even if no adjustments were made to their expenses, therefore, the Debtors would have more than $1,200.00 per month in disposable income to dedicate to a Chapter 13 plan, simply by eliminating the payroll deductions related to the 401(k) plan. ($8,566.00 minus $7,305.00 = $1,261.00).

### 2. Expenses

It appears, however, that certain adjustments to the Debtors' expenses may be appropriate in this case.

By far the largest item on Schedule J is the mortgage payment in the amount of $2,675.00 per month. Other expenses on Schedule J include the sum of $438.00 attributed to home maintenance. The allocation for home maintenance includes $125.00 for a lawn service, and $85.00 for a pool service. (Debtors' Exhibit 1).

■ There is no "bright line" test, of course, for determining whether a particular expense is excessive or unreasonable. Instead, the standard under § 707(b) is whether the expense is reasonably necessary for the support and maintenance of the debtor and his dependents.

In applying this standard, courts have generally found home mortgage payments and home maintenance expenses to be excessive in circumstances similar to the facts of this case. In *In re Dabbas*, 2000 WL 33672948 (Bankr.D.Utah), for example, the Court concluded that the debtor's housing expenses in excess of $4,000.00 per month were unreasonable.

> By selling their $410,000 home and eliminating or reducing many of the expenses incident to the ownership of that home, the Debtors could significantly reduce their expenses. This may not be a pleasant experience for the Debtors, but *under the totality of the circumstances test, if debtors can reduce expenses without being deprived of adequate food, clothing, shelter, or other necessities, they must do so or risk dismissal of their case under 11 U.S.C. § 707(b)*.

*In re Dabbas*, 2000 WL 33672948, at *3(Emphasis supplied). See also *In re Shaw*, 311 B.R. 180 (Bankr.M.D.N.C.2003), *aff'd*, 310 B.R. 538 (M.D.N.C.2004)(home expenses of $3,349.28 to maintain a 3,200 square foot home were unwarranted); and *In re Engskow*, 247 B.R. 314 (Bankr. M.D.Fla.2000)(home expenses of $2,184.53, over half the debtor's budget, were unreasonable).

In this case, it is difficult to quantify the Debtors' monthly expenses that are unreasonable or excessive. It appears, however, that the mortgage payment and certain other expenses associated with the Debtors' upscale 3,650 square foot home could be reduced without depriving the Debtors or their children of adequate food, shelter, and clothing.

### 3. "Disposable income"

■ As set forth above, after eliminating the payroll deduction related to the 401(k) plan, the Debtors have a minimum of $1,200.00 per month in disposable income that would be available to fund a plan in a Chapter 13 case. Such a plan would provide $43,200.00 to creditors over a period of 36 months, or $72,000.00 to creditors over a period of 60 months. Further, if the Debtors' budget were adjusted to reduce or eliminate certain expenses associated with their home, a Chapter 13 plan could yield a significantly greater distribution to creditors.

According to the calculations of William Orr, a senior bankruptcy analyst with the UST's office, the Debtors received disposable income in the amount of $1,236.00 per month, after certain adjustments were made to their budget. (Transcript, Vol.I, p. 115). Although the analyst's method of calculation differs from the Court's, it is noteworthy that his final computation of disposable income ($1,236.00) is nearly identical to the figure used by the Court ($1,200.00) as the minimum amount that the Debtors should have available for payment to creditors.

The Debtors have the ability to repay a substantial portion of their debts through a hypothetical Chapter 13 plan.

### B. Other factors

### 1. Events precipitating bankruptcy

■ In evaluating the totality of the circumstances under § 707(b), courts generally consider whether the debtor's case was filed as the result of an unforeseen, catastrophic event. *In re Meyn*, 330 B.R. at 289–90; *In re Shields*, 322 B.R. at 897.

In this case, no sudden catastrophic event preceded the filing of the Debtors' bankruptcy petition. The Debtors have been steadily employed at well-paying jobs, and are in reasonably good health. Although the Debtors' daughter has been diagnosed with a genetic disorder, their financial difficulties were not caused by any extraordinary medical expenses.

On the contrary, it appears that the Debtors' Chapter 7 petition was precipitated by their decision to purchase and retain a home in an upscale, gated community, even after they should have known that the home was not affordable for them.

First, the Debtors knew when they contracted to buy the home that the deposit previously paid to MacRiley Homes may not be recovered. As early as November 7, 2001, the Debtors' attorney wrote a letter to MacRiley Homes stating that the Debtors knew that the company "is no longer conducting business, has closed its office and no longer has any employees." (UST's Exhibit 16). On October 31, 2002, the Debtors' attorney wrote a letter to the Florida Department of Business and Professional Regulation, stating that MacRiley's attorney had informed him as early as mid-November of 2001 that "MacRiley no longer had the Jones' deposit and that MacRiley would not be able to reimburse Mr. and Mrs. Jones for their monetary loss." (UST's Exhibit 16).

The Debtors knew when they purchased the Bermuda Isle Drive home that any recovery from MacRiley was speculative at best.

Second, the Debtors knew when they bought the home in December of 2002 that Darryl Newman had incurred substantial debt on the credit cards issued in William Jones' name. William Jones acknowledged that he knew that the "obligation was high" when they bought the house, and that the "amounts were going up."

(Transcript, Vol.I, pp. 32, 42). In fact, the Debtors' application for the construction loan on the house was initially declined because of the amount of the debt incurred by Darryl Newman in William Jones' name. (Transcript, Vol.I, p. 44). Nevertheless, the Debtors proceeded to purchase the home, and now seek to discharge approximately $70,000.00 in credit card debt charged by Darryl Newman with their permission.

Third, the Debtors withdrew the sum of $217,000.00 from William Jones' 401(k) account in order to make a substantial cash payment toward the purchase price for the home.

The Debtors are both educated people who have long careers in finance. Janet Jones testified that she knew that there would be a tax consequence associated with the withdrawal from the 401(k) plan, however, she did not anticipate the consequences of the higher rate of tax that would be applicable to the substantial increase in taxable income.

Janet Jones further testified that she became aware of the extent of the tax liability on April 15, 2003, as she was preparing the Debtors' 2002 tax return. The tax return ultimately filed by the Debtors for the 2002 tax year shows income taxes owed in the approximate amount of $100,000.00.

The Debtors contend that the filing of their Chapter 7 petition was caused by the convergence of the three factors described above: (1) their decision to allow Darryl Newman to use their credit; (2) their failure to anticipate the tax liability associated with the 401(k) withdrawal; and (3) their failure to anticipate the total loss of their deposit to MacRiley Homes. The Debtors further contend that these actions were simply innocent mistakes in judgment on their part, and that they would have acted

differently had they been able to predict the impact of the decisions on their finances.

█ Clearly, the three financial setbacks suffered by the Debtors were unfortunate events, and were important factors that contributed to the filing of their Chapter 7 petition. The issue under § 707(b), however, is not whether the Debtors have experienced unfortunate financial losses in the past. The issue under § 707(b) is whether the Debtors are genuinely in "need" of the relief provided by Chapter 7. *In re Shields*, 322 B.R. at 898.

The Court finds that the Debtors' case is not a case that should proceed under Chapter 7. Despite their known financial difficulties, the Debtors have chosen to retain their $400,000.00 home, and to apply virtually all of their income to the expenses attendant to the home, while their creditors remain unpaid.

In evaluating similar situations, courts generally have found that such choices constitute a substantial abuse of the provisions of Chapter 7. See *In re Meyn*, 330 B.R. at 289–91(Chapter 7 case dismissed where debtor resided in a 4,000 square foot house and enjoyed significant annual income and other benefits associated with an "upper-middle class lifestyle"); *In re Brown*, 301 B.R. at 612–13(Substantial abuse found where the debtors' Chapter 7 was precipitated by "chronically living beyond their means," and where the debtors could pay a substantial portion of their debt with only "modest adjustments to their lifestyle"); and *In re Cox*, 249 B.R. at 33("Even though the Debtor's lifestyle is not necessarily extravagant, he has shown that his debts came about due to ill-advised non-business credit card spending. When confronted with mounting bills, instead of altering his spending habits, the Debtor filed for Chapter 7 bankruptcy.").

In this case, the Debtors reside in a 3,650 square foot home with a pool in a gated community. The home is worth approximately $400,000.00. By their own calculations, more than $200,000.00 in equity existed in the home at the time that they filed their bankruptcy petition. The Debtors earn combined gross income of more than $136,000.00 per year, and own two fairly late model vehicles and a retirement account with JPMorganChase containing $108,000.00.

The Debtors' Chapter 7 case was not the result of unforeseen catastrophic events. The case was precipitated by the Debtors' unwillingness to sell the home and adjust their lifestyle, even after they became aware of their financial difficulties in early 2003.

## 2. The payments to the Internal Revenue Service

In March of 2004, the Debtors entered into an agreement with the Internal Revenue Service regarding their 2002 tax liability. As a result of the agreement, the Debtors made a lump sum payment to the IRS in March in the approximate amount of $24,000.00, followed by four installment payments in April, May, June, and July of 2004.

Janet Jones acknowledges that she obtained cash of $12,000.00 from her Chase Visa account, and cash of $15,000.00 from her Sears account, in mid to late March. Janet Jones also acknowledges that she used $24,000.00 of the total amount obtained from the credit card accounts to pay the Internal Revenue Service. Finally, Janet Jones acknowledges that the two credit cards sustained an increased balance as a result of the transaction. (Transcript, Vol.I, p. 75).

Chase Gold Visa and Sears Gold Master Card are listed as unsecured debts on the Debtors' bankruptcy schedules in the

amounts of $13,200.00 and $14,300.00, respectively.

William Jones initially met with the Debtors' bankruptcy attorney in early March of 2004. The Debtors' Chapter 7 petition was filed on June 9, 2004.

Janet Jones contends that she was not contemplating bankruptcy, and that she did not understand the difference between nondischargeable debts and dischargeable debts, at the time that the payments to the IRS were made. (Transcript, Vol.I, p. 86).

Nevertheless, the transactions occurred within the three-month period (but more than 60 days) prior to the filing of the bankruptcy petition, and had the clear effect of converting nondischargeable debt into debt that the Debtors seek to discharge in their Chapter 7 case. Further, it appears that the transaction occurred after William Jones had consulted with their bankruptcy attorney.

The transaction, standing alone, is not dispositive of whether this case is a substantial abuse of the provisions of Chapter 7. The transaction is, however, an additional factor that is properly considered in a "totality of the circumstances" analysis under § 707(b). In this context, the Court finds that the transaction supports the conclusion that the Debtors have knowingly attempted to use the bankruptcy process for their personal advantage.

## II. Section 707(a)

In the Motion under consideration, the UST also seeks dismissal of this case for "cause" under § 707(a) of the Bankruptcy Code. "Cause" is not expressly defined in § 707, although three examples of "cause" (unreasonable delay, nonpayment of fees, and failure to file the financial information required by the Bankruptcy Code) are enumerated in the section. "The only guidance Congress provided as

to the meaning of 'cause' in this section is an admonition that the 'ability of the debtor to repay his debts in whole or in part [does not] constitute [ ] adequate cause for dismissal.'" *In re Wagnitz,* 2004 WL 626821, at *3 (N.D.Ill.)(quoting H.R. Rep. 95–595, at 380 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6336).

Cases arising under § 707(a) generally focus on whether "cause" includes the debtor's bad faith in filing the Chapter 7 petition. See *In re Johnson,* 318 B.R. 907 (Bankr.N.D.Ga.2005).

The Court in *In re Mottilla,* 306 B.R. 782 (Bankr.M.D.Pa.2004) discussed the distinction between dismissal for "cause" under § 707(a) and dismissal for "substantial abuse" under § 707(b):

This Court concludes that the two subsections do not necessarily require consideration of mutually exclusive criteria. Thus, issues related to a debtor's income and expenses may be part of the analysis under either subsection. However, the examination of the debtor's intent relative to his reporting of income and expenses is clearly different under each provision. Under Section 707(a) the existence of disposable income is considered *in the context of whether or not the debtor showed bad faith by artificially inflating expenses or by intentionally concealing income sources ....* The overall distinction to be made between the two subsections is that § 707(a) focuses *on the debtor* and particularly his intent ("good" or "bad" faith) in filing. Section 707(b) focuses *on the purpose of Chapter 7 relief under the Bankruptcy Code,* primarily the issue of whether the petitioner is the honest and needy consumer debtor the Code was intended to protect.

*In re Mottilla,* 306 B.R. at 787–88(Emphasis in original). In determining whether "cause" for dismissal exists under § 707(a),

therefore, the appropriate inquiry is whether the debtor was motivated to file the petition by improper purposes, as evidenced by false or misleading information provided in his disclosures to the Court.

In this case, the Court is satisfied that the Debtors did not file their petition in bad faith within the meaning of § 707(a). The schedules and statements filed by the Debtors were generally accurate. Although minor discrepancies were noted by the UST, the omissions were corrected and were not shown to be material. Further, the Debtors appeared at the trial of this matter, and testified truthfully and candidly regarding their financial affairs. This is not a case in which assets were concealed or misrepresented.

Under these circumstances, the Court finds that "cause" does not exist to dismiss this case under § 707(a) of the Bankruptcy Code.

### Conclusion

The issue presented by the UST's Motion is whether this case should be dismissed as a substantial abuse of the provisions of Chapter 7 pursuant to § 707(b) of the Bankruptcy Code, or whether it should be dismissed for "cause" pursuant to § 707(a) of the Bankruptcy Code.

The Court has evaluated the issue under § 707(b) based on the totality of the circumstances, with primary emphasis placed on the Debtors' ability to repay at least a portion of their obligations through a hypothetical Chapter 13 plan. Under this analysis, the Court finds that the case represents a substantial abuse of the bankruptcy process within the meaning of § 707(b), and that the case should be dismissed under that subsection.

After eliminating certain inappropriate payroll deductions and unnecessary expenses, the record shows that the Debtors receive at least $1,200.00 per month of disposable income, as defined in § 1325 of the Bankruptcy Code. Consequently, the Court finds that the Debtors have the ability to pay a substantial portion of their debt in the context of a Chapter 13 plan.

Further, the Court finds that the case was not precipitated by any unforeseen or catastrophic event, but is instead the result of the Debtors' failure to modify their lifestyle after learning of their substantial unsecured debt and tax liabilities.

Finally, within the three-month period (but more than 60 days) immediately preceding the filing, the Debtors obtained substantial cash advances from credit cards and reduced their nondischargeable tax liability by increasing the unsecured debt that they now seek to discharge in the Chapter 7 case.

Based on the totality of the circumstances, the Court finds that the case should be dismissed pursuant to § 707(b) of the Bankruptcy Code.

The case should not be dismissed pursuant to § 707(a) of the Bankruptcy Code, however, because the petition was not filed in bad faith within the meaning of that subsection.

Accordingly:

**IT IS ORDERED** that:

1. The Motion to Dismiss Pursuant to 11 U.S.C. § 707(b), or Alternatively, 11 U.S.C. § 707(a), filed by the United States Trustee, is granted as set forth in this Order.

2. The above-captioned case is dismissed pursuant to § 707(b) of the Bankruptcy Code.

3. The effective date of the dismissal is delayed for ten (10) days from the date of this Order. Within such (10) days, the Debtors may convert their case to a case under Chapter 13 of the Bankruptcy Code.

If no motion to convert is filed, the case shall stand as dismissed.