In re Thomas A. TAGLIAVIA and Greta A. Tagliavia, Debtors.

No. 8:05–bk–18412–PMG.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Oct. 2, 2006.

---

662

Buddy D. Ford, Kim L. Kaszuba, Buddy D. Ford, P.A., Tampa, FL, for Debtor.

Denise Barnett, Benjamin E. Lambers, Tampa, FL, Office of U.S. Trustee.

## ORDER ON UNITED STATES TRUSTEE'S SECOND AMENDED MOTION TO DISMISS PURSUANT TO 11 U.S.C. § 707(b), OR ALTERNATIVELY, 11 U.S.C. § 707(a)

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing to consider the Second Amended Motion to Dismiss Pursuant to 11 U.S.C. § 707(b), or Alternatively, 11 U.S.C. § 707(a). The Motion was filed by the United States Trustee.

The United States Trustee (the UST) asserts that the Debtors, Thomas A. Tagliavia and Greta A. Tagliavia, own real and personal property of significant value, and earn net income that exceeds $18,000.00 per month.

The UST further asserts that certain of the Debtors' scheduled expenses are not reasonably necessary for their support or maintenance, and that the Debtors should be able to fund a plan under Chapter 13 of the Bankruptcy Code.

For these and other reasons, the UST seeks the entry of an Order dismissing the Debtors' bankruptcy case as a "substantial

abuse" of the provisions of Chapter 7 within the meaning of § 707(b) of the Bankruptcy Code. Alternatively, the UST seeks dismissal of the case for "cause" pursuant to § 707(a) of the Bankruptcy Code.

In response, the Debtors contend that the filing of the bankruptcy case was precipitated by Mr. Tagliavia's unexpected loss of employment in 2002, that they immediately attempted to reduce their expenditures, and that their current expenses are reasonable given the size and special needs of their family. The Debtors contend that a legitimate financial need exists for the relief provided by Chapter 7, and that the case was not filed in bad faith.

### Background

Prior to 2002, Thomas Tagliavia was employed by Cavu, Inc. as its Vice President of Sales and Business Development. Cavu, Inc. was engaged in the business of providing internet service.

Greta Tagliavia, has been employed by Nextel Communications, now known as Sprint, since approximately 1996.

In the 2000 tax year, the Debtors received combined income from their employment in the amount of $443,643.00. (UST's Exhibit 12a; Debtors' Exhibit 10).

In the 2001 tax year, the Debtors received combined income from their employment in the amount of $309,629.00. (UST's Exhibit 12a; Debtors' Exhibit 11).

In November of 2001, Cavu, Inc. filed a petition under Chapter 11 of the Bankruptcy Code. Cavu, Inc.'s Chapter 11 case was converted to a case under Chapter 7 in February of 2002, and Mr. Tagliavia's employment was terminated at that time.

Mr. Tagliavia was unable to find comparable employment during the year following the closure of Cavu, Inc. The Debtors' tax return for 2002 reflects combined income of $145,396.00, including $10,340.00 received as unemployment compensation. (UST's Exhibit 12a; Debtors' Exhibit 12),

In 2003, Mr. Tagliavia became employed by Brijot Imagine Systems as the Vice President of Business Development. Brijot markets a millimeter wave camera. (Transcript, p. 36).

The Debtors' combined income in 2003 totaled $239,417.00, and their combined earnings in 2004 totaled $312,679.00. (UST's Exhibit 12).

On September 13, 2005, the Debtors filed a petition under Chapter 7 of the Bankruptcy Code.

On their schedule of real property, the Debtors listed their home in Tampa at a value of $600,000.00. The home is encumbered by a first mortgage in the scheduled amount of $351,930.00, and a second mortgage in the scheduled amount of $120,538.00.

On their schedule of personal property, the Debtors listed Mrs. Tagliavia's 401(k) account in the amount of $80,000.00, and two small checking accounts. According to the Debtors' schedule of secured claims, the 401(k) account is encumbered by two separate liens in the amount of $22,000.00 and $20,000.00, respectively.

During the course of the bankruptcy case, the Chapter 7 Trustee obtained an appraisal of the Debtors' household furnishings and personal property. According to the Appraiser's Report, the Debtors' household goods, collectibles, clothing, jewelry, sports equipment, and office equipment were valued at $8,160.00. (UST's Exhibit 10; Debtors' Exhibit 6).

The appraiser also valued the Debtors' 2002 Ford Mustang at $7,100.00. The Mustang was encumbered by a lien in the scheduled amount of $8,112.00 at the time that the bankruptcy petition was filed.

Finally, as of the filing date, the Debtors scheduled an interest in two other vehicles and a boat. First, the Debtors disclosed that they lease a 2005 Jaguar at the rate of $1,034.00 per month, and a 2002 Jaguar at the rate of $471.00 per month. They also disclosed an ownership interest in a 1999 21' Stingray boat. The boat was scheduled at a value of $10,000.00, and was encumbered by a lien in the amount of $21,000.00.

On their schedule of priority claims, the Debtors listed income taxes owed to the Internal Revenue Service for the 1999, 2000, and 2001 tax years in the total amount of $122,620.00. The Debtors filed an adversary proceeding against the IRS, and obtained a determination that the taxes due for 1999 and 2000 are dischargeable in the bankruptcy case. The Debtors' obligations relating to the 2001 tax year, however, are not dischargeable. (Adv.05–810).

The Debtors listed general unsecured claims on their schedules in the total amount of $226,747.12. The claims primarily consist of credit card obligations, some of which have been reduced to judgment, tax penalties and interest, and deficiencies on two repossessed vehicles.

### Discussion

The UST contends that the Debtors "have the ability to pay a substantial portion of their unsecured creditors over time," and that the Debtors have made no effort in recent years to "tighten their belts." (Doc. 92). Consequently, the UST asserts that this case should be dismissed under § 707(b) of the Bankruptcy Code as a substantial abuse of the provisions of Chapter 7, or alternatively, that the case should be dismissed under § 707(a) of the Bankruptcy Code, for "cause."

### I.  Section 707(b)

Section 707(b) of the Bankruptcy Code, as in effect on the date that the Debtors filed their Chapter 7 petition, provides in part:

**11 USC § 707.  Dismissal**

. . .

(b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts *if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter.* There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b)(Emphasis supplied). The UST bears the burden of proving that a chapter 7 case should be dismissed under § 707(b). *In re O'Conner,* 334 B.R. 462, 466 (Bankr.N.D.Fla.2005).

In evaluating motions to dismiss under § 707(b), courts in the Eleventh Circuit generally agree that the outcome should depend on the "totality of the circumstances." "In the absence of controlling Eleventh Circuit authority, bankruptcy courts in this District have examined the 'totality of the circumstances' to determine whether to dismiss a case for 'substantial abuse.'" *In re Meyn,* 330 B.R. 286, 288–89 (Bankr.M.D.Fla.2005).

Courts also agree, however, that the primary factor in the analysis is whether the debtor has the ability to repay even a portion of his liabilities pursuant to a hypothetical chapter 13 plan. *In re Meyn,* 330 B.R. at 288–90; *In re Leung,* 311 B.R. 626, 630–31 (Bankr.S.D.Fla.2004); *In re Brown,* 301 B.R. 607, 611 (Bankr. M.D.Fla.2003)("A debtor's ability to pay as measured by what he could pay in a hypothetical Chapter 13 case is the primary but not conclusive factor in determining

whether there is a substantial abuse of Chapter 7."). See also *In re Cox*, 249 B.R. 29, 31 (Bankr.N.D.Fla.2000) and *In re Dorwarth*, 258 B.R. 293, 295 (Bankr. S.D.Fla.2001).

## A. Ability to pay

To determine whether a debtor has the "ability to pay" his creditors within the meaning of § 707(b), it is necessary to consider the amount of the "disposable income" that would be available for such payment. *In re Jones*, 335 B.R. 203, 208 (Bankr.M.D.Fla.2005); *In re Shields*, 322 B.R. 894, 897 (Bankr.M.D.Fla.2005).

"Disposable income" is defined as "income which is received by the debtor and which is not reasonably necessary to be expended—(A) for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2).

For purposes of § 707(b), therefore, a preliminary issue is whether the Debtors receive income that exceeds the amount that they need for their maintenance or support, so that they would be able to repay a portion of their debts through a hypothetical Chapter 13 plan.

### 1. Income

In this case, the Court finds that Mr. Tagliavia receives average net income in the amount of $9,800.25 per month. Specifically, Mr. Tagliavia receives net income in the amount of $4,523.19 for each two-week pay period of the year. (UST's Exhibit 13a; Transcript, pp. 141–42). The Court agrees with the UST's conclusion, therefore, that his average monthly income should be calculated by multiplying his biweekly net income by 26 pay periods, and dividing that number by twelve. (Transcript, p. 142). The result is $9,800.25.

Mrs. Tagliavia's average monthly net income is much more difficult to compute.

Mrs. Tagliavia receives compensation in the form of (1) a base salary, and (2) commissions dependent on sales over quota. (Transcript, p. 166).

Mrs. Tagliavia's "pay inquiries" are admitted into evidence for the period beginning on October 29, 2005, and ending on June 7, 2006. (UST's Exhibit 14a; Debtors' Exhibit 4). The pay inquiries are difficult to interpret, however, for several reasons.

First, Mrs. Tagliavia previously was awarded stock options as additional compensation. According to Mrs. Tagliavia, the stock options were treated as income at the time that they were exercised, and apparently designated as "commissions" on her pay inquiry. The pay inquiry for the period ending on June 7, 2006, reflects year-to-date "commissions" in the amount of $32,160.90, for example, even though Mrs. Tagliavia testified that approximately $20,000.00 of that amount represented stock options that she exercised during the year. (Transcript, pp. 172–73, 201–04).

Mrs. Tagliavia's employer discontinued the award of stock options in May of 2005.

Second, it is difficult to interpret Mrs. Tagliavia's pay inquiries because they reflect contributions to her 401(k) account in varying amounts. The contributions range from a low of $65.60 on January 28, 2006, for example, to a high of $394.81 on April 26, 2006. (UST's Exhibit 14a). Although no definite explanation for the variance was presented at trial, it appears that the contributions are calculated as a percentage of her base salary, or a percentage of her commissions, or both. (Transcript, p. 213). In any event, the method of computing the contribution clearly affects the net pay received by Mrs. Tagliavia each month.

Third, the pay inquiries reflect amounts deducted for withholding taxes and other charges, apparently based on Mrs. Taglia-

via's "federal taxable gross" earnings. Obviously, therefore, the amount of the withheld taxes fluctuates according to the amount of the commissions earned by Mrs. Tagliavia, and the extent to which she exercised any stock options during a specific pay period.

Finally, some of the pay inquiries include earnings designated as a car allowance, which Mrs. Tagliavia no longer receives, and entries reflecting the periodic repayment of two 401(k) loans.

For all of these reasons, it is difficult to extrapolate Mrs. Tagliavia's average monthly net income from the pay inquiries admitted into evidence.

For purposes of the UST's Motion to Dismiss under § 707(b), however, the Court finds that Mrs. Tagliavia's average net income equals $6,941.99 per month.

This figure was calculated by multiplying her current biweekly pay rate of $3,430.08 by 26 weeks, for a yearly gross base salary of $89,182.08.

To this figure, the Court added the sum of $4,800.00 as Mrs. Tagliavia's estimated 401(k) contributions for a single year. (UST's Exhibit 14a).

Further, the Court added the sum of $24,321.80, which represents Mrs. Tagliavia's estimated commissions for one year. The Court estimated Mrs. Tagliavia's annual commissions by starting with the amount designated as "commissions" on the June 7, 2006, pay inquiry ($32,160.90), subtracting the amounts that were characterized as commissions when Mrs. Tagliavia exercised her stock options ($20,000.00), and then doubling the difference to annualize her actual commissions.

According to these calculations, therefore, Mrs. Tagliavia's annual gross income is $118,303.88. ($89,182.08 base salary + $4,800.00 401(k) contributions +

$24,321.80 commissions = $118,303.88 annual gross income).

The Court then subtracted the sum of $35,000.00 from Mrs. Tagliavia's total gross income. The amount subtracted represents the taxes and related sums that are projected to be withheld from her gross earnings on an annual basis, as estimated from the amount that was withheld in 2005. (UST's Exhibit 12a; Debtors' Exhibit 4). The difference, or Mrs. Tagliavia's annual net income, is $83,303.88. ($118,303.88 minus $35,000.00 = $83,303.88).

The annual net income is then divided by 12 to reach Mrs. Tagliavia's estimated monthly net income of $6,941.99. ($83,303.88 divided by 12 months = $6,941.99).

The Court's estimated monthly net income of $6,941.99 is slightly greater than the amount projected by the Debtors ($6,745.17), and less than the amount projected by the UST ($8,716.49).

In any event, based on the foregoing, the Court finds that the Debtors' combined monthly net income equals $16,742.24, consisting of Mr. Tagliavia's monthly net income of $9,800.25, and Mrs. Tagliavia's monthly net income of $6,941.99.

### 2. Expenses

The issue is whether the Debtors have the ability to fund a hypothetical Chapter 13 plan from their projected "disposable income." In its analysis of the "disposable income" issue, the Court has first determined that the Debtors' estimated net income equals $16,742.24 per month.

The second component of the equation involves a determination of the expenses that are reasonably necessary for the support or maintenance of the Debtors and the Debtors' dependents.

The Debtors contend that the expenses that are reasonably necessary for the sup-

port and maintenance of their family total $18,221.00 per month.

The UST contends, on the other hand, that the reasonably necessary expenses for the Debtors' family should equal only $10,598.42 per month, after reducing or eliminating certain excessive items from their budget.

The parties agree on the amounts allocated for several key expenses, such as the Debtors' first and second home mortgage payments ($3,520.00 and $1,271.00, respectively), food and clothing ($1,770.00), and medical care (a total of $395).

Additionally, the parties have relatively minor disagreements regarding the amounts budgeted for electricity and gas ($700.00 v. $600.00), water and sewer ($200.00 v. $165.00), and home maintenance ($400.00 v. $300.00).

Further, the apparent disagreement between the parties regarding the amount allocated for court-ordered child support may simply stem from an admitted error on the Debtors' original schedules. The Debtors had listed the amount of the obligation as $350.00 per month in their original Schedule J, and the UST subsequently used the sum of $371.00 in its proposed budget. Mr. Tagliavia testified, however, that the scheduled support payment was erroneous, and that he is actually required to pay the sum of $1,350.00 per month as child support, representing a current payment of $675.00, and an arrearage payment of $675.00 per month. (Transcript, pp. 78, 118). The Court accepts Mr. Tagliavia's testimony, and also accepts the sum of $1,350.00 as the Debtors' monthly child support obligation.

Given the above, therefore, it appears that no true disagreement exists as to more than $9,000.00 of the expenses that are set forth in the Debtors' budget.

■ Rather, the disputed items in the budget primarily relate to monthly expenditures for items such as cable and internet, cell phones, dry cleaning, children's expenses, vehicle loans, and other transportation costs. The UST contends that these expenses are the result of extravagant lifestyle choices made by the Debtors, and are excessive for that reason.

Specifically, the Debtors included the following expenses in their budget: (1) Cable/internet/fax $250.00; (2) Cell phones $250.00; (3) Dry cleaning $250.00; (4) Installment payments on a 2002 Jaguar, a 2005 Jaguar, and a 2002 Ford Mustang totaling $1,858.00; (5) Automobile insurance and other transportation costs totaling $2,355.00; and (6) School and children's expenses totaling $1,167.00.

Although the Court acknowledges that the expenditures are substantial, the Court does not find that they are excessive under the circumstances of the Debtors' case.

The Debtors have five children. One child is in college, three are teenagers, and one is ten years old. The ten-year-old has a learning disability and requires special tutoring and after-school care. (Transcript, p. 187). The teenagers share the Mustang. Mrs. Tagliavia testified that the teens are preparing for college, and use the vehicle to participate in extra curricular and service projects while the Debtors are at work. (Transcript, p. 188).

Additionally, the Court recognizes that the Debtors are employed in positions in which they must maintain some expenses as a necessity of their employment. Mrs. Tagliavia testified, for example, that the Debtors have significantly reduced their dry cleaning and clothing expenditures in recent years, and that the budgeted amounts are necessary to maintain their professional appearance. (Transcript, pp. 182–83).

Perhaps more importantly, Mr. Tagliavia conceded that the car payment for his 2005 Jaguar may appear unreasonable in other contexts, but that his employer is a small company engaged in the development of a new product. Mr. Tagliavia testified that he is frequently required to meet potential customers off-site, and that it is critical for him to drive an automobile of this nature in order to establish and maintain business relationships. (Transcript, pp. 113–14).

Under these circumstances, the Court determines that the expenses listed by the Debtors in their budget are reasonably necessary for the maintenance or support of the Debtors or their dependents.

The Debtors' proposed expenses are therefore accepted for purposes of determining their disposable income, with two exceptions.

■ First, the Debtors listed a payment to the Internal Revenue Service in the amount of $1,250.00 per month. The payments are made pursuant to an installment arrangement with the IRS to satisfy the Debtors' 2005 tax liability in the amount of $15,000.00. (Transcript, pp. 118–19). It appears that these payments constitute the payment of a debt, as opposed to the payment of a current expense, and should not be included in the Debtors' budget for purposes of determining whether the Debtors could fund a hypothetical Chapter 13 plan. *In re Attanasio,* 218 B.R. 180, 183 (Bankr.N.D.Ala.1998).

■ Second, the Debtors listed payments on two 401(k) loans in the total amount of $793.00 per month. It is generally held that 401(k) loan repayments are not reasonably necessary for a debtor's support or maintenance, and should be treated as available income for purposes of determining the debtor's "ability to pay" under § 707(b). *In re Jones,* 335 B.R. at

209(quoting *In re Keating,* 298 B.R. 104, 110–11 (Bankr.E.D.Mich.2003) and *In re Collins,* 2004 WL 3510107, at *4 (M.D.N.C.)).

Based on the foregoing, the Court finds that the expenses that are reasonably necessary for the Debtors' maintenance or support total the sum of $16,178.00. This figure represents the total amount of the expenses proposed by the Debtors, less amounts allocated to "non-dischargeable taxes" and 401(k) loan repayments, ($18,221.00 minus $1,250.00 minus $425.00 minus $368.00 = $16,178.00).

### 3. Disposable income

As set forth above, the Debtors' combined net income equals $16,742.24 per month, and the Debtors' reasonably necessary expenses total $16,178.00 per month. Accordingly, the Debtors' disposable income equals the sum of $564.24 per month. ($16,742.24 minus $16,178.00 = $564.24).

If this amount were dedicated to a Chapter 13 plan, such a plan would yield less than $20,312.64 for creditors over a period of 36 months, after payment of the Trustee's fees and various administrative costs.

On their schedule of assets and liabilities, the Debtors listed unsecured priority claims in the amount of $122,620.00. This total amount constitutes income taxes relating to the 1999, 2000, and 2001 tax years in the amounts of $46,075.00, $52,627.00, and $18,919.00, respectively. The Debtors also listed general unsecured claims in the total amount of $226,747.12, primarily consisting of credit card debt, tax claims, and deficiencies on two repossessed vehicles.

Given the Debtors' disposable monthly income of $564.24, in contrast to the total amount of the their priority and unsecured claims, the Court finds that the Debtors are unable to pay a meaningful portion of their debts out of their future income in

the context of a Chapter 13 plan. In fact, even if the Debtors were able to obtain confirmation of a plan, it is unlikely that unsecured creditors would receive any distribution from the Chapter 13 Trustee after payment of the Debtors' substantial priority claims.

The Court has considered the Debtors' ability to repay their creditors as a primary factor in its § 707(b) analysis, and cannot find that this case represents a substantial abuse of the provisions of Chapter 7.

## B. Other factors

As set forth above, even though a debtor's ability to pay is a primary factor, bankruptcy courts in the Eleventh Circuit generally examine the "totality of the circumstances" to determine whether a Chapter 7 case should be dismissed as a "substantial abuse" under § 707(b). *In re Meyn*, 330 B.R. at 288–89.

The Court acknowledges that certain circumstances are present in this case which indicate that Chapter 7 relief may be inappropriate.

It is undisputed, for example, that the Debtors earned significant income in the years prior to the filing, and that their W–2 Earnings Summaries reflect combined annual income that exceeded $320,000.00 in 2005. (UST's Exhibit 12).

It is also undisputed that the Debtors reside in a 3,100 square-foot, four-bedroom, three and one-half bath home on a lake. The home has an oversized garage and a swimming pool, and the Hillsborough County Property Appraiser's "just (market) value" as of the date of filing was approximately $568,985.00. (UST's Exhibit 11; Debtors' Exhibit 7). The parties appear to agree that the home has appreciated in value since the date of the property appraiser's report, and that it now has a just market value of $624,536.00. (Transcript, p. 217).

Finally, the Debtors concede that they leased two Jaguar automobiles approximately six months before filing the bankruptcy petition, that they failed to list a Mastercard debt on their schedules, and that Mr, Tagliavia had filed a previous Chapter 7 case in 1995. (Transcript, pp. 70–72, 154, 45).

These circumstances suggest that granting the relief requested by the Debtors might result in a substantial abuse of the provisions of Chapter 7.

Nevertheless, the Court finds that other factors are also present in the case that weigh convincingly in favor of allowing the Debtors to obtain the relief that they seek under Chapter 7.

First, the filing of the case was precipitated by the drastic reduction in income that the Debtors experienced in late 2001 and early 2002. Mr. Tagliavia testified, for example, that his salary at Cavu, Inc. was reduced by one-half in October of 2001, and that Cavu, Inc. closed and terminated his employment in January of 2002. Mr. Tagliavia received unemployment compensation, and was employed only briefly in other jobs, during the remainder of 2002. (Transcript, pp. 37–38).

The Debtors' income was further reduced in May of 2005 when Mrs. Tagliavia's employer discontinued its program of issuing stock options as additional compensation. (Transcript, pp. 166, 172,176).

Second, a large percentage of the Debtors' expenses, such as two mortgage payments and the monthly utilities, are related to their home. It appears, however, that the home was purchased in 1999, approximately six years before the bankruptcy case was filed, at a time when the Debtors were able to afford the purchase

of the home and its associated expenses. (UST's Exhibit 25).

In any event, upon the termination of Mr. Tagliavia's employment by Cavu, Inc., the Debtors took immediate steps to decrease their expenditures. It is clear that the Debtors effectively discontinued the use of their credit cards as of early 2002. Mr. Tagliavia testified, for example, that the Debtors' credit card debt arose in 2001, while he was still employed by Cavu, Inc., and that the Debtors did not use their credit cards after his employment was terminated in 2002. (Transcript, pp. 38, 133–34). Mrs. Tagliavia also testified that they had not made any charges on the credit cards listed in their schedules in three years. (Transcript, p. 193).

In fact, the UST's evidence appears to corroborate the Debtors' testimony in this regard, since the UST introduced documentation showing that Debtors had used only one credit card within the years prior to the bankruptcy filing, and that this sole active account reflected a maximum balance of only $300.00. (Transcript, pp. 147–54, 161–62; UST's Exhibit 19).

Additionally, the Debtors testified that their other efforts to reduce expenditures included removing their son from private school, foregoing all vacations and most entertainment, and decreasing their car payments by approximately $1,000.00 per month. (Transcript, pp. 129, 183). The Debtors are also surrendering their boat, which has not been used in several years. (Transcript, pp. 77–78).

Third, despite their efforts to reduce their expenditures, the Debtors were unable pay the credit card obligations that had been incurred before Mr. Tagliavia's employment was terminated in 2002. The Debtors testified, for example, that six judgments have been entered against them, and that they had been served with approximately six additional lawsuits at the time that they filed their bankruptcy petition. Mrs. Tagliavia's wages had been garnished as a result of one of the judgments. (Transcript, pp. 134–36,194).

Further, the Internal Revenue Service had begun aggressive collection activities regarding the income taxes that were due from 1999, 2000, and 2001, and was demanding a rigorous installment schedule. (Transcript, pp. 134–35).

In 2005, the Debtors attempted to obtain a mortgage loan to fund a settlement of their debt, and hired an attorney to negotiate with their creditors. The loan was ultimately declined, however, and the out-of-bankruptcy workout was not successful. (Transcript, pp. 132–33).

In summary, the Court finds that (1) the bankruptcy filing was precipitated by the unexpected loss of Mr. Tagliavia's employment and the reduction of Mrs. Tagliavia's compensation package; (2) the Debtors have five children, including one in college, three teenagers, and a ten-year-old with special needs; (3) the debts which the Debtors seek to discharge in their Chapter 7 case are generally three years old or older, and were incurred at a time when the Debtors were able to pay them; (4) the Debtors attempted to pay the debts outside of bankruptcy, but were unable to do so; (5) the Debtors have a legitimate need for Chapter 7 relief, as evidenced by the judgments, the lawsuits, and the IRS's collection efforts that were pending when the case was filed; and (6) the Debtors' schedules were generally accurate, and there has been no allegation that the Debtors concealed assets or provided misleading information to the Court or to creditors. See *In re Johnson*, 318 B.R. 907, 916–17 (Bankr.N.D.Ga.2005).

The Court has considered all of these factors, and finds that the totality of the circumstances weighs in favor of granting

the relief requested by the Debtors, and that the case is not a substantial abuse of the provisions of Chapter 7 within the meaning of § 707(b) of the Bankruptcy Code.

## II. Section 707(a)

█ In the Motion under consideration, the UST also seeks dismissal of this case for "cause" under § 707(a) of the Bankruptcy Code. "Cause" is not expressly defined in § 707(a), although three examples of "cause" (unreasonable delay, nonpayment of fees, and failure to file the financial information required by the Bankruptcy Code) are enumerated in the section. "The only guidance Congress provided as to the meaning of 'cause' in this section is an admonition that the 'ability of the debtor to repay his debts in whole or in part [does not] constitute [ ] adequate cause for dismissal.'" *In re Wagnitz*, 2004 WL 626821, at *3 (N.D.Ill.)(quoting H.R. Rep. 95–595, at 380 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5963, 6336).

Cases arising under § 707(a) generally focus on whether "cause" includes the debtor's bad faith in filing the Chapter 7 petition. See *In re Johnson*, 318 B.R. 907 (Bankr.N.D.Ga.2005).

█ The Court in *In re Mottilla*, 306 B.R. 782 (Bankr.M.D.Pa.2004) discussed the distinction between dismissal for "cause" under § 707(a) and dismissal for "substantial abuse" under § 707(b):

This Court concludes that the two subsections do not necessarily require consideration of mutually exclusive criteria. Thus, issues related to a debtor's income and expenses may be part of the analysis under either subsection. However, the examination of the debtor's intent relative to his reporting of income and expenses is clearly different under each provision. Under Section 707(a) the existence of disposable income is consid-

ered *in the context of whether or not the debtor showed bad faith by artificially inflating expenses or by intentionally concealing income sources....* The overall distinction to be made between the two subsections is that § 707(a) focuses *on the debtor* and particularly his intent ("good" or "bad" faith) in filing. Section 707(b) focuses *on the purpose of Chapter 7 relief under the Bankruptcy Code,* primarily the issue of whether the petitioner is the honest and needy consumer debtor the Code was intended to protect.

*In re Mottilla*, 306 B.R. at 787–88(Emphasis in original). In determining whether "cause" for dismissal exists under § 707(a), therefore, the appropriate inquiry is whether the debtor was motivated to file the petition by improper purposes, which may be evidenced by false or misleading information provided in his disclosures to the Court.

In this case, the Court is satisfied that the Debtors did not file their petition in bad faith within the meaning of § 707(a). The schedules and statements filed by the Debtors were generally accurate. Although the Debtors contend that their expenses are greater than originally listed on their Schedule J, the Court is satisfied that the revised expenses are not inflated or artificial, given the Debtors' professional and family obligations. Further, the Debtors were compelled to file the Chapter 7 petition by urgent financial pressures, as evidenced by the pending lawsuits, outstanding judgments and garnishments, and collection efforts of the Internal Revenue Service. Finally, the Debtors appeared at the trial of this matter, and testified truthfully and candidly regarding their financial affairs. This is not a case in which assets were concealed or misrepresented.

Under these circumstances, the Court finds that "cause" does not exist to dismiss this case under § 707(a) of the Bankruptcy Code.

## Conclusion

The issue presented by the UST's Motion is whether this case should be dismissed as a substantial abuse of the provisions of Chapter 7 pursuant to § 707(b) of the Bankruptcy Code, or whether it should be dismissed for "cause" pursuant to § 707(a) of the Bankruptcy Code.

The case should not be dismissed under either § 707(b) or § 707(a).

First, the Court has evaluated the Debtors' combined net income and monthly expenses, and finds that the Debtors would be unable to repay a meaningful portion of their debts out of future earnings in the context of a Chapter 13 case. Additionally, other factors present in this case, such as the severe reduction in income that preceded their financial difficulties, weigh in favor of granting the relief requested. The case does not represent a substantial abuse of the provisions of Chapter 7 within the meaning of § 707(b) of the Bankruptcy Code.

Second, the case should not be dismissed pursuant to § 707(a) of the Bankruptcy Code, because the Debtors did not file the case in bad faith or for an improper purpose within the meaning of that section.

The UST'S Motion should be denied.

Accordingly:

**IT IS ORDERED** that the United States Trustee's Second Amended Motion to Dismiss Pursuant to 11 U.S.C. § 707(b), or Alternatively, 11 U.S.C. § 707(a) is denied.