**In the Matter of Jamie Alan WALKER, Catherine Bell Walker, Debtors.**

**No. 05–15010–WHD.**

United States Bankruptcy Court,
N.D. Georgia,
Newnan Division.

March 5, 2008.

H. Brooks Cotten, H. Brooks Cotten, P.C., Newnan, GA, for Debtors.

R. Jeneane Treace, U.S. Trustee, Atlanta, GA, U.S. Trustee.

## ORDER

W. HOMER DRAKE, JR., Bankruptcy Judge.

Before the Court is the Motion to Dismiss filed by the United States Trustee in the above-captioned bankruptcy case. The Debtors oppose the Motion. Following an evidentiary hearing held on October 9, 2007, the Court took this matter under advisement. This matter is a core proceeding, over which this Court has subject matter jurisdiction. *See* 28 U.S.C. § 157(b)(2)(A); § 1334. The following constitutes the Court's findings of fact and conclusions of law.

### PROCEDURAL HISTORY

The Debtors filed a voluntary petition under chapter 7 of the Bankruptcy Code on October 26, 2005. Accordingly, section 707(b), as amended by the BAPCPA,[1] applies to the Debtors' case. In accordance with Rule 1007, the Debtors filed a statement of current monthly income on Official Form B22. *See* FED. R. BANKR.P. (Interim Rule) 1007(b)(4); Official Form B22(A). Following her review of the Debtors' Form B22A and other documents filed by the Debtors, the U.S. Trustee filed a Notice of Presumed Abuse. The Debtors responded to the Notice, asserting that no presumption of abuse had arisen. The Court

scheduled a hearing for January 27, 2006 on the issue of whether a presumption of abuse had arisen. Specifically, the U.S. Trustee objected to the Debtors' deduction from Current Monthly Income ("CMI") certain expenses, which the U.S. Trustee asserted were unreasonably high, and challenged the Debtors' deduction from CMI of payments due on secured debts on the basis that the Debtors had surrendered or intended to surrender the collateral securing those debts. At the hearing, the parties requested that the Court rule on the issue of whether the secured debt payments were deductible prior to considering whether the other miscellaneous expense deductions were appropriate. Accordingly, the Court took that issue under advisement and continued the hearing on all other issues.

On May 1, 2006, the Court held that the Debtors were permitted to deduct from CMI the amount of all secured debt payments, regardless of whether the Debtors intended to surrender or had surrendered the collateral. Due to the outstanding issue with regard to the deductibility of the other expenses, the Court scheduled for May 26, 2006 a further hearing on the presumption issue and a hearing on the U.S. Trustee's motion to dismiss for abuse pursuant to section 707(b)(3). The May 26th hearing was rescheduled, for various reasons, to July 14, 2006, August 25, 2006, November 17, 2006, and April 18, 2007. An evidentiary hearing was eventually held on October 9, 2007.

■ At the evidentiary hearing, the Debtors asserted that the U.S. Trustee's motion should be denied on the basis of laches. The Court appreciates the fact that this case has been pending for two years without resolution. Although the docket does not reflect the specific rea-

1. *See* S. 256, Pub.L. 109-8, 119 Stat. 23 (2005).

sons for the rescheduling of each hearing date, the Court's recollection is that the many resets afforded to the parties in this case did not result solely from the U.S. Trustee's requests. The hearing has been rescheduled to accommodate both the Debtors' counsel's vacation schedule and the U.S. Trustee's attorney's unexpected illness. The primary delay in the case, however, has been the fact that, once an evidentiary hearing was scheduled, the parties agreed that they would stipulate to findings of fact and asked the Court to rule on the basis of the parties' briefs. Because the parties were subsequently unable to stipulate to the facts, the Court was later informed that an evidentiary hearing would be required and that additional time would be required to conduct further discovery. The U.S. Trustee's motion was timely filed, and, due to the unique circumstances of this case, the Court declines to invoke any equitable exception that would bar the relief sought by the U.S. Trustee.

### FINDINGS OF FACT

The Debtors are married and have three sons, ages 22, 21, and 16, respectively. In 1991, the Debtors filed a voluntary Chapter 7 petition. The filing of that bankruptcy case was occasioned by the loss of Mrs. Walker's employment. At that time, the Debtors surrendered their residence, which was encumbered by a first and second mortgage, and two vehicles.

Subsequent to the discharge of the Debtors' first Chapter 7 case, the Debtors resided with Mrs. Walker's mother for a

period of time. They eventually obtained a new mortgage with Washington Mutual Home Loans in order to purchase another residence. Because the home had only three bedrooms, and the Debtors had three children, the Debtors incurred a second mortgage with Homecomings Financial in order to renovate their basement to provide additional bedrooms. Following the filing of this bankruptcy petition, the Debtors surrendered that residence.

At the time of the filing of the instant case, the Debtors also owned four vehicles, a 2001 Ford F-150, a 2000 Chevrolet Blazer, a 1989 Toyota pick-up truck, and a 1992 Geo Storm. The 2001 Ford F-150 was subject to a lien held by AmSouth Bank, and the Blazer was encumbered by a lien held by Fidelity Bank. The Debtors owned the remaining two vehicles free and clear. The Debtors subsequently reaffirmed the debt on the 2001 Ford F-150 and surrendered the Blazer. The Geo Storm and the Toyota pick-up truck became inoperable, and the Debtors replaced these vehicles with a 1993 Dodge Dakota[2] and a 2001 Dodge Ram.

The evidence submitted establishes that the Debtors did not file their current bankruptcy petition as a consequence of any illness or calamity.[3] Upon the filing date, the Debtors scheduled approximately $83,000 of unsecured debt.[4] The Debtors' adjusted gross income for purposes of their 2006 Federal income tax return was $85,327. In January 2006, after surrendering their residence, the Debtors moved to a rental home, in which they now reside

**2.** Mr. Walker testified that his mother-in-law purchased this vehicle for his use and that the vehicle is not encumbered.

**3.** The Debtors testified that Mrs. Walker missed a week's worth of work after the filing of the petition due to a case of shingles. Additionally, Mr. Walker testified that his wife was in an automobile accident prior to the

filing. However, the accident occurred in 1994, eleven years prior to the filing of this petition.

**4.** This amount does not include any deficiencies that might have resulted from the surrender of the Debtors' home and vehicle.

with their youngest son. The Debtors' two older children attend the University of West Georgia in Carrollton, Georgia and live at or near the university's campus.

The Debtors have stable employment with stable incomes. Mr. Walker has maintained the same employment for the past nineteen years with Hoshizaki America. Mrs. Walker is employed by the Coweta County School System, where she has been employed for the past seven years. As of September 2007, the Debtors had a combined monthly net pay of approximately $5854.[5] Going forward, the Debtors' projected monthly net pay is approximately $5000 due to an expected reduction in Mr. Walker's overtime by at least one half.[6]

The Debtors' household expenses include: $925 for rent, $243 for utilities, $62 for water and sewer, $90 for basic telephone, $200 for cellular telephones, $75.16 for cable, $25 for internet access, $785 for food, $150 for clothing, $50 for medical and dental, $340 for auto insurance,[7] and $600 for transportation (not including automobile installment payments). As of the time of the hearing, the Debtors' monthly postpetition debt service included a $157 per month payment to Circuit City for a big-screen television and other electronics and computer equipment; a $139 per month payment on a debt reaffirmed with the Bank of Coweta,[8] a monthly student loan payment of $150 for Timothy and a monthly student loan payment of $69 for Matthew; a payment of $197 per month on the 2001 Dodge Ram; a payment of $309 per month for a 2005 Ford F–150;[9] and a payment of $430 per month for the reaffirmed debt that is secured by the 2001 Ford F–150. The Debtors also testified that they give approximately $500 per month to Timothy and Matthew for spending money and $300 per month to Matthew to assist with his rent. Accordingly, the Debtors' combined monthly expenses and debt payments total $5796.16.

Many of these installment payments and household expenses were incurred for and are made for the benefit of the Debtors' two adult sons. These expenses include the payment of $309 per month for Timothy's vehicle (the 2005 Ford F–150), $66 per month for car insurance on Timothy's vehicle, $500 to $1,000 per semester for Timothy's books, $120 per month for cellular phones for Timothy and Matthew, the payment of $430 per month for Matthew's vehicle (the 2001 Ford F–150), $144 per month for car insurance, $300 to $400 per semester for Matthew's books, $500 per month for spending money for both sons, and $300 per month for Matthew's apartment rent. As noted above, the Debtors also make a payment of $69 per month on a student loan incurred to permit Matthew to attend college and are repaying a student loan incurred for Timothy's tuition with payments of between $150 and $200 per month. The Debtors also pay for the

---

5. This amount includes average monthly net pay for Mr. Walker of $4527 based on regular pay, average overtime pay, and average bonus pay taken from his September 14, 2007 pay advice and monthly net pay of $1327 for Mrs. Walker based on her September 28, 2007 pay advice.

6. In calculating this amount, the Court reduced the average overtime pay taken from the year-to-date figure on Mr. Walker's September 14, 2007 pay advice by half and ad-justed the expected payroll tax withholding accordingly.

7. This figure includes the cost of insurance for the 2005 Ford F–150 driven by Timothy and the 2001 Ford F–150 driven by Matthew.

8. Mr. Walker testified that this debt would be paid off at the end of 2007.

9. Timothy purchased this vehicle after the filing of the Debtors' case.

annual registration and taxes associated with both vehicles.

### CONCLUSIONS OF LAW

Under section 707(b)(1), the court, after notice and a hearing, may dismiss a chapter 7 case of an individual whose debts are primarily consumer debts, or, with the debtor's consent, convert it to chapter 13, if the court finds that granting relief under chapter 7 would be an abuse of the provisions of chapter 7. *See* 11 U.S.C. § 707(b)(1). "In considering ... whether the granting of relief would be an abuse of the provisions of [chapter 7], the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of ... 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or ... $10,000." *See id* § 707(b)(2)(A)(I). The Court has previously held that no presumption of abuse has arisen in the Debtors' case.

Section 707(b)(3), however, provides that "[i]n considering under [section 707(b)(1)] whether the granting of relief would be an abuse of the provisions of [chapter 7] in a case in which the presumption in [section 707(b)(1)(A)(i)] does not arise or is rebutted, the court shall consider—(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse." *Id.* § 707(b)(3).

 The Debtors have asserted that, once a debtor has "passed" the means test, the Court should decline to "re-write" a debtor's budget or to consider whether the debtor has engaged in voluntary belt-tightening, including the surrender of collater-

al, in order to maximize the benefits associated with their "fresh start." The Court rejects the Debtors' argument because it presupposes that the means test was designed to protect debtors from further inquiry as to their actual post-petition financial condition, including their actual income and expenses. "Failing" the means test subjects the debtor to a presumption that granting relief would be an abuse, but "passing" the means test does not result in a presumption that granting relief is not an abuse. *See In re Mestemaker,* 359 B.R. 849 (Bankr.N.D.Ohio 2007) ("The plain meaning of the phrase debtor's financial situation must include a debtor's actual income and expenses, since such information is the starting point for any analysis of an individual's financial situation."); *see also In re Henebury,* 361 B.R. 595 (Bankr. S.D.Fla.2007).

The Court acknowledges the Debtors' argument that considering a reduction in expenses that results from the surrender of collateral penalizes those debtors who make good financial decisions and sacrifice their homes and vehicles in order to place themselves in a better financial position. The Court agrees that such decision making should be encouraged. Nonetheless, the obvious purpose of the BAPCPA amendments to section 707(b) is to channel debtors who have the ability to pay even a portion of their debts into chapter 13. *See Eisen v. Thompson,* 370 B.R. 762 (N.D.Ohio 2007) ("The 2005 Act signaled a sea change in the bankruptcy world. Under the prior regime, nearly all debtors obtained a complete discharge under Chapter 7. Now, any debtor who is likely to have the ability to repay even a small portion of his or her debts at any time over the next five years will have to participate in a partial repayment plan under Chapter 13."). Congress has made the policy choice that requires consideration of

a debtor's actual post-petition income and expenses, and it is not for this Court to disregard a debtor's actual ability to pay in the interest of encouraging debtors to surrender unnecessary collateral. Furthermore, consideration of post-petition expense reductions has been part of the 707(b) "totality of the circumstances" test since before the BAPCPA amendments. *See In re Lamanna*, 153 F.3d 1 (1st Cir. 1998) (finding a substantial abuse because debtor had the ability to pay 100% of his debts with money that he would normally have spent on housing had he not chosen to live with his parents rather than maintain his own household). Nothing persuades the Court that, in achieving the purpose of the BAPCPA amendments, Congress intended the Court to distinguish between debtors who have always had disposable income available and debtors who have become able to pay their debts either due to an increase in income or a decrease in expenses, including a decrease that results from the surrender of collateral. *See, e.g., In re Haar*, 373 B.R. 493 (Bankr. N.D.Ohio 2007) (holding that "income made available to the [d]ebtors after they surrendered their residence may be considered when analyzing whether their case should be dismissed for abuse under the 'totality of circumstances' test"); *In re Hess*, 2007 WL 3028422 (Bankr.N.D.Ohio Oct. 15, 2007); *In re Hare*, 2007 WL 201249 (Bankr.E.D.Cal. Jan.24, 2007) (unpublished) (debtor had available income to repay creditors in a chapter 13 case because he surrendered his house post-petition and was paying less in rent than he previously paid in mortgage payments); *In re Maya*, 374 B.R. 750 (Bankr.S.D.Cal. 2007) (court can consider reduction in post-petition expenses arising from surrendered collateral); *In re Pennington*, 348 B.R. 647 (Bankr.D.Del.2006) (considering reduction in expense due to surrender of vehicle

when determining whether debtor had the ability to pay creditors).

■ That being said, the Court does recognize that, absent a presumption of abuse, the U.S. Trustee is required to come forth with evidence to persuade the Court that relief would be an abuse. *See In re Doherty*, 374 B.R. 288 (Bankr.D.Kan. 2007). In that regard, section 707(b)(3) codified "two judicially created tests" for determining, under the old section 707(b), whether a debtor's chapter 7 case should be dismissed for substantial abuse. *See In re Singletary*, 354 B.R. 455, 461–62 (Bankr.S.D.Tex.2006); *In re Bender*, 373 B.R. 25 (Bankr.E.D.Mich.2007); *In re Rollins*, 2007 WL 2106087 (Bankr.M.D.Ga. July 16, 2007); *In re Hess*, 2007 WL 3028422 (Bankr.N.D.Ohio Oct. 15, 2007) (prior to BAPCPA, courts dismissed cases for "substantial abuse," which "could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances"; "Congress incorporated this judicially created construct in § 707(b)(3)"). Accordingly, bankruptcy courts have looked to pre-BAPCPA case law for guidance in determining whether to dismiss a chapter 7 case pursuant to section 707(b). *See In re Doherty*, 374 B.R. 288 (Bankr.D.Kan.2007).

Prior to the enactment of the BAPCPA, this Court employed a "totality of the circumstances" test to determine whether a chapter 7 case was a substantial abuse under former section 707(b). *See In re Tefertiller*, 104 B.R. 513 (Bankr.N.D.Ga. 1989) (Drake, J.). In that case, the Court noted that the debtors' ability to fund a chapter 13 plan was but one factor to be considered, in addition to such factors as "whether the petition was filed due to a calamity, such as illness, disability or unemployment; whether the schedules indicate cash advancements were incurred in excess of the debtor's ability to repay

them; whether the debtor's budget is extravagant or excessive; and whether the statement of income represents the debtor's true financial condition." *Id.* Other bankruptcy courts in this circuit have employed similar versions of the totality of the circumstances test. *See In re Rollins,* 2007 WL 2106087 at *5 (Bankr.M.D.Ga. July 16, 2007); *In re Johnson,* 318 B.R. 907 (Bankr.N.D.Ga.2005) (the debtor's ability to pay debts, as measured by what could be paid in hypothetical chapter 13 case is not the conclusive factor); *In re O'Conner,* 334 B.R. 462 (Bankr.N.D.Fla. 2005).

■ In relying on pre-BAPCPA case law, this Court recognizes that section 707(b)(3) specifically directs the Court to consider whether the debtor filed the petition in bad faith *or* whether "the totality of the circumstances ... of the debtor's financial situation" demonstrates an abuse. 11 U.S.C. § 707(b)(3); *see also In re Henebury,* 361 B.R. 595 (Bankr.S.D.Fla.2007) ("Thus, the debtor's total financial situation as a measure of ability to pay, and bad faith are separate and sufficient grounds for dismissal. Either ability to pay *or* bad conduct in connection with the bankruptcy will warrant dismissal for abuse under § 707(b)(3)."); *In re Parada,* 2008 WL 126626 (Bankr.S.D.Fla. Jan. 10, 2008). Consequently, the Court will not follow pre-BAPCPA cases to the extent that they considered factors demonstrating bad faith in filing the petition as part of the totality of the circumstances. Additionally, the Court will keep in mind the fact that the BAPCPA removed the presumption in favor of granting the debtor relief and lowered the standard required for dismissal from a showing of a "substantial abuse" to a showing of an "abuse." *See In re Mondragon,* 2007 WL 2461616 (Bankr.D.N.M. Aug. 24, 2007). With these caveats in mind, and acknowledging that the U.S.

Trustee has not asserted that the Debtors filed their petition in bad faith, the Court will consider the following factors to determine whether the totality of the circumstances of the Debtors' financial situation demonstrates an abuse:

1) whether the bankruptcy filing was precipitated by an unseen catastrophic event, such as a sudden illness or unemployment;

2) whether the debtor is eligible for chapter 13 relief;

3) whether there are non-bankruptcy remedies available to the debtor;

4) whether the debtor can obtain relief through private negotiations;

5) whether the debtors' proposed budget is excessive or unreasonable;

6) whether the debtor has a stable source of future income;

7) whether the debtors could provide a meaningful distribution in a chapter 13 case; and

8) whether the debtors' expenses could be reduced significantly without depriving them and their dependents of necessities.

■ To determine whether a debtor is able to pay a significant portion of his debts, it is necessary to consider the amount of the "disposable income" that would be available for such repayment. *In re Shields,* 322 B.R. 894, 897 (Bankr. M.D.Fla.2005) (citing *In re Pier,* 310 B.R. 347, 353 (Bankr.N.D.Ohio 2004)). As set forth above, for example, a debtor's "ability to pay" is generally measured by calculating the income that the debtor would be able to commit to a plan in a hypothetical chapter 13 case. *In re Jones,* 335 B.R. 203 (Bankr.M.D.Fla.2005). The primary factor, however, is whether the debtor has the ability to repay even a portion of his debts from future income. *See In re Shields,* 322 B.R. at 897; *In re Leung,* 311

B.R. 626, 631 (Bankr.S.D.Fla.2004). The "totality of the circumstances" approach involves an evaluation of the other stated factors as exacerbating or mitigating the apparent abuse from the debtor's ability to repay. *In re Meyn,* 330 B.R. 286 (Bankr. M.D.Fla.2005).

■■■ Having considered the testimony of the Debtors and the evidence before the Court, the Court finds that the totality of the Debtors' financial circumstances indicates that granting relief under Chapter 7 would be an abuse. The Debtors have the income to pay a meaningful dividend to unsecured creditors. The impetus for the filing of their petition was not illness, calamity, or job loss. Instead, it appears to the Court that the Debtors simply reordered their priorities once their two oldest children reached college age. The Debtors have re-directed their income to enable them to provide Timothy and Matthew with cell phones, spending money, book money, rent assistance, vehicles, and car insurance. The Court is not implying that supporting college-age children is not admirable when parents have the means to do so. However, the Court agrees with its learned colleagues that supporting adult children at the expense of unsecured creditors is not permissible. *See In re Hess,* 2007 WL 3028422 (Bankr.N.D.Ohio Oct. 15, 2007) (debtor's contribution of $300 per month to support her 24–year old son while attending optometry school was not proper deduction from income); *In re Pfahler,* 2007 WL 2156401 (Bankr.

N.D.Ohio 2007) (finding abuse where debtor had stable employment and income and was spending $350 per month for the support of his college-age son) (citing *U.S. Trustee v. Harrelson,* 323 B.R. 176, 179 (W.D.Va.2005), *In re Staub,* 256 B.R. 567, 571 (Bankr.M.D.Pa.2000), and *In re Studdard,* 159 B.R. 852, 856 (Bankr.E.D.Ark. 1993)); *In re Hicks,* 370 B.R. 919, 923 n. 7 (Bankr.E.D.Mo.2007) (holding that the debtor was not entitled to deduct under section 707(b)(2) expenses of college-age son because "[f]or an adult to be able to attend college as a full-time student is a luxury, not a necessity, and the costs associated with such attendance do not constitute expenses incurred for the provision of a person's *necessary* care and support"); *In re Haar,* 373 B.R. 493 (Bankr.N.D.Ohio 2007) (expenses for maintenance of two cars and cell phones for debtors' adult daughters were not appropriate allocation of debtor's financial resources).

The Debtors have no legal obligation to support Timothy and Matthew, who are now able-bodied adults. The Debtors propose to shift the use of their income from paying their own obligations to enable their adult children to attend college full time without the burden of working to support themselves. This results in the devotion of at least $1860 per month to support Timothy and Matthew.[10] Without these expenses, the Debtors' monthly expenses and payments for debt service would total $3,788.16.[11] Even with the

---

10. This figure includes $309 for Timothy's vehicle payment, $66 for Timothy's car insurance, $60 for Timothy's cell phone, $200 spending money given to Timothy, $430 for Matthew's vehicle payment, $144 for Matthew's insurance, $300 spending money given to Matthew, $300 for Matthew's rent, and $60 for Matthew's cell phone. It does not include student loan payments, book money, or amounts spent to pay for annual registration fees for the vehicles.

11. This includes $925 for rent, $243 for utilities, $62 for water and sewer, $90 for basic telephone, $80 for cellular telephone, $75.16 for cable, $25 for internet access, $785 for food, $150 for clothing, $50 for medical and dental, $130 for auto insurance, and $600 for transportation (not including automobile installment payments), $157 per month payment to Circuit City, $150 per month for Timothy's student loan payment, $69 per

Debtors' lower projected monthly net income of $5,000, the Debtors would be left with approximately $1200 per month with which to pay a substantial portion of their unsecured debt. Permitting a discharge in this case would be an abuse, as the Debtors are not needy. While it would take time and sacrifice to do so, the Debtors can repay a portion of their debt. Contribution of this $1200 per month would amount to $72,000 over the life of a 60–month chapter 13 plan. Even assuming that the $83,448 in scheduled unsecured debt is increased substantially by the filing of deficiency claims by the mortgage and car creditors, contribution of these funds to a chapter 13 plan would still result in a worthwhile dividend to unsecured creditors.

The Debtors argue that, in a chapter 13 plan, they would be permitted to propose a 0% dividend plan and, accordingly, unsecured creditors would receive no payment. The Debtors point to the case of *In re Doherty*, 374 B.R. 288 (Bankr.D.Kan.2007), in which the bankruptcy court declined to dismiss he case in partial reliance on the fact that the debtors, as above-median income debtors, would be able to use the IRS deductions to calculate their disposable income, which would result in zero dollars being paid to the debtors' unsecured creditors.

■ While this may or may not be the case, the Court agrees with the statement made in *In re Carney*, 2007 WL 4287855 (Bankr.N.D.Ohio Dec. 5, 2007), that, because the debtor's ability to pay unsecured creditors in a hypothetical chapter 13 case is just one factor to be considered in determining whether a chapter 7 discharge would be an abuse, the fact that no unsecured dividend would be required in a chapter 13 case is not necessarily determi-

native. As the court in *Carney* noted, these debtors are eligible to be debtors under chapter 13 should they decide to convert their case. Based on their current budget, they are *capable* of proposing a meaningful dividend to unsecured creditors. They will be entitled and required to propose a plan that deals fairly and in good faith with their secured and unsecured creditors. That may mean proposing a dividend to their unsecured creditors. If, however, at the end of the day, they are entitled to a discharge of all or most of their unsecured debt, that will be the result that is mandated by the Bankruptcy Code.

The Court has not yet considered many of the legal issues that will be relevant to this determination, such as: 1) whether, in a chapter 13 case, an above-median income debtor is entitled to deduct secured debt payments for collateral that has been surrendered for purposes of determining projected disposable income, *compare In re Oliver*, 2006 WL 2086691 (Bankr.D.Or. 2006) (deduction permitted), *with In re Spurgeon*, 378 B.R. 197 (Bankr.E.D.Tenn. 2007) (deduction not allowed) *and In re Crittendon*, 2006 WL 2547102 (Bankr. M.D.N.C. Sept. 1, 2006) (same); 2) whether the requirement that a plan be filed in good faith requires a chapter 13 debtor to propose a dividend when projected disposable income is a negative number or zero, but the debtor has significant actual disposable income available for payment to unsecured creditors, *compare In re Barr*, 341 B.R. 181 (Bankr.M.D.N.C.2006) (not appropriate to consider whether debtor is contributing all actual disposable income to plan payment as part of good faith analysis) *and In re Winokur*, 364 B.R. 204 (Bankr.E.D.Va.2007) (if the debtor has proposed a plan payment that complies with the mathematical requirements of

month for Matthew's student loan payment,

and $197 per month for the 2001 Dodge Ram.

section 1325(b), the debtor has "done everything Congress asked him to do" and such a plan is proposed in good faith), *with In re Edmunds*, 350 B.R. 636 (Bankr. D.S.C.2006) (because debtor's actual income and expenses showed that they had the ability to pay a greater amount to unsecured creditors than plan proposed, debtors' plan was not proposed in good faith), *and In re McGillis*, 370 B.R. 720 (Bankr.W.D.Mich.2007) (if debtor's plan payment complies with the requirements of section 1325(b), court may still deny confirmation on the basis that debtor's failure to make an honest effort to repay creditors is a lack of good faith); and 3) whether the debtor's actual expenses may be deducted in lieu of the 707(b)(2) means test expense deductions, *compare In re Hughey*, 380 B.R. 102 (Bankr.S.D.Fla. 2007) (holding that a debtor's actual income can be considered for purposes of determining projected disposable income, but the debtor's actual expenses may not be considered), *with In re Ries*, 377 B.R. 777 (Bankr.D.N.H.2007) (for purposes of projected disposable income, above-median income chapter 13 debtor's expenses are calculated in accordance with section 707(b)(2), but debtor or party opposing confirmation can rebut the amount of those expenses with evidence of actual expenses), *and In re Edmunds*, 350 B.R. 636 (Bankr.D.S.C.2006) (when determining "projected disposable income," court can consider the debtor's actual income and actual expenses). It is not appropriate to resolve these issues in a case in which no chapter 13 case is pending and may never be pending, as the Debtors may determine that a non-bankruptcy resolution is preferable to conversion. *In re Carney*, 2007 WL 4287855 (Bankr.N.D.Ohio Dec. 5, 2007) ("Contrary to the implication of Debtors' argument, the court does not believe that it is necessary, or even possible,

in this case to decide the legal and factual issues that might arise should they elect to convert to Chapter 13 in order to analyze whether it would be an abuse for them to obtain a Chapter 7 discharge.").

Having considered the totality of the circumstances, the Court finds that the relevant factors support the conclusion that granting the Debtors a chapter 7 discharge would be an abuse of chapter 7. Specifically, the Debtors' bankruptcy filing was not precipitated by an unforseen catastrophic event, such as a sudden illness or unemployment; the Debtors' proposed budget is excessive and unreasonable because it allocates a significant amount of the Debtors' income to the support of their two adult children; the Debtors are relatively young and in good health and have only one remaining dependent child who will reach his majority in less than three years; and the Debtors could reduce their monthly expenses significantly without depriving themselves and their remaining dependent son of necessities. Additionally, the Debtors have a stable and regular income that is above the state median income, and they are eligible to be debtors in a chapter 13 case.

Accordingly, the Court will grant the Debtors fifteen (15) days from the date of the entry of this Order to convert the case to one under chapter 13. In the event the Debtors fail to file a motion to convert within that time period, the Court will enter a subsequent order dismissing the case under section 707(b)(3).