**IN RE Joseph W. NAVIN and Valerie Renee Navin, Debtors.**

**CASE NO. 14–57838–PMB**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed March 10, 2016

Filed March 11, 2016

John Brookhuis, Brookhuis Law, LLC, Karen King, King & King Law LLC, Atlanta, GA, for Debtors.

### ORDER ON ACTING UNITED STATES TRUSTEE'S MOTION TO DISMISS PURSUANT TO 11 U.S.C. §§ 707(b)(3)

Paul Baisier, U.S. Bankruptcy Court Judge

This case was filed under Chapter 7 of Title 11, United States Code (the "*Bankruptcy Code*") on April 21, 2014 (the "*Petition Date*"). The *Acting United States Trustee's Motion to Dismiss Based on Presumption of Abuse Arising Under 11 U.S.C. § 707(b)(2) and Abuse Arising Under 11 U.S.C. § 707(b)(3)*, filed in this case on July 21, 2014 (Docket No. 35)(the "*Motion*"), the *Answer and Defenses to Acting United States Trustee's Motion to Dismiss Based on Presumption of Abuse Arising Under 11 U.S.C. § 707(b)(2) and Abuse Arising Under 11 U.S.C. § 707(b)(3)*, filed in this case on August 18, 2014 (Docket No. 39)(the "*Response*"), and related pleadings, came before the Court for hearing on December 14, 2015 (the "*Hearing*"). As a result of prior rulings of this Court,[1] the Hearing was limited to the

---

1. The *Order On Motion to Dismiss for Abuse,* entered February 11, 2015 (Docket No. 51), and the *Order On Motion to Dismiss for Abuse,* entered July 8, 2015 (Docket No. 56).

Acting United States Trustee's request to dismiss this case pursuant to 11 U.S.C. § 707(b)(3).

Lindsay Swift Kolba appeared at the Hearing on behalf of the Acting United States Trustee (the *"US Trustee"*), and John Brookhuis appeared on behalf of the Debtors. Both Debtors testified at the Hearing, and the U.S. Trustee presented the testimony of one of his analysts, Deborah R. Jackson. After consideration of the Motion, the Response, the related pleadings, the Debtors' Schedules, the Statement of Financial Affairs, and other documents filed by the Debtors in this case, the testimony of the witnesses, and the evidence presented at the Hearing, and for the reasons set forth below, the Court **GRANTS** the Motion. The Debtors shall have fourteen (14) days from the entry of this Order to convert their case to one under Chapter 13 (or to a case or cases under Chapter 11 if they are not eligible for Chapter 13), or this case will be dismissed.

This matter is a core proceeding over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.[2]

### FACTS

The Debtors are husband and wife. They are both in their early 50's, have been married about twenty-five (25) years, and have five (5) children. At all relevant times, Mr. Navin has been gainfully employed, and Mrs. Navin has been a homemaker and stay-at-home mother.[3] Since 2013, Mr. Navin has worked for Mother Parker's Tea & Coffee, a Canadian beverage company, in an executive position. His compensation from Mother Parker's consists of a base salary and a year-end bonus. The bonus is not guaranteed, depends on his performance and that of the company, and can be as high as 40% of his salary. In 2012 and 2013, Mr. Navin earned just in excess of $300,000 per year.[4] In 2013, Mr. Navin earned a salary of over $200,000, and a gross bonus of around $90,000. In 2014, Mr. Navin earned a salary of $216,000 and a net bonus of approximately $45,000. In 2015, Mr. Navin earned a salary of $220,000. He expects a bonus for 2015, but that bonus had not been determined or paid as of the date of the Hearing. He also expects a raise in his salary in 2016. Mr. Navin has been employed in an executive position at Mother Parker's and other beverage companies for at least the past 10 years.

The Debtors' financial difficulties began in 2006 from a somewhat unlikely source. A business in which Mr. Navin was involved was sold, and he received a bonus (or some sort of other special compensation) of around $450,000 in connection with the sale. For reasons that were not entirely clear, the Debtors either paid no taxes on this additional compensation or they paid inadequate taxes on such compensation. In any event, the Debtors ended up with an unpaid tax liability to the Internal Revenue Service of around $165,000, and an unpaid tax liability to the State of Maryland of around $75,000.[5]

---

2. Where appropriate in this Memorandum Decision, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

3. Mrs. Navin last worked in the mid 1990's.

4. Statement of Financial Affairs, Item 1 (Docket No. 1).

5. The initial amounts may have been smaller, but the Debtors scheduled the claim of the IRS at $164,678, and the claim of the State of

In 2007, the Debtors purchased a home in the northern part of Fulton County, Georgia, in an area that subsequently became the City of Milton. In connection with the purchase, they borrowed $744,000 from a lender secured by a first mortgage. At some point they also borrowed an additional sum from a second mortgage lender. The home is a large suburban home and originally housed the Debtors and all of their children.

During the period from 2009 to 2011, each of the Debtors' mothers became ill. Mrs. Navin's mother lived with the Debtors for part of this time. These illnesses added to the financial strain on the Debtors. Both mothers eventually passed away. In April, 2010, Capital One obtained a judgment against the Debtors for about $5,000, presumably on a credit card,[6] suggesting the onset of real financial strain. Around March of 2011, the Debtors ceased making the payments on their first mortgage.[7] In October, 2011, Old Republic, the second mortgage lender, obtained a $125,067 judgment against the Debtors.[8]

The Debtors filed their bankruptcy petition under Chapter 7 of the Bankruptcy Code on April 14, 2014. By the Petition Date, the Debtors were $280,000 behind on their first mortgage,[9] the second mortgage creditor and the State of Maryland had obtained judgments against them,[10] and they were being sued by the State of Georgia and Fulton County for other amounts.[11] As of the Petition Date, the Debtors' two oldest children, who are twins, were attending Georgia Southern University, and their next oldest child was attending Georgia Perimeter College. The two youngest children were in public schools in North Fulton County.

In their bankruptcy filings, the Debtors expressed an intention to surrender their home to the first mortgage creditor.[12] The Debtors believe that the home was foreclosed on in April or May, 2015,[13] and they vacated the home in July, 2015. At that time, the Debtors moved with their two youngest children to Trophy Club, Texas, near Ft. Worth. This move was made at the request of Mr. Navin's employer, which has its U.S. headquarters in that area. The Debtors' three (3) oldest children remained in an apartment in the Atlanta area paid for in part by the Debt-

Maryland at $75,000. Because an initial notice was sent out in this case telling creditors not to file proofs of claim unless they were later advised to do so, and because no bar date has been set for claims, no claims have been filed in this case. Consequently, the Court's knowledge about asserted claims is derived entirely from the Statement of Financial Affairs and related Schedules filed by the Debtors. Docket Nos. 1, 32, & 40.

6. *See* Docket No.1, Schedule D.

7. *See* Motion for Relief from Stay, filed by Christiana Trust on May 23, 2014 (Docket No. 18), Paragraph 3 ("Through the month of April 2014, thirty-seven (37) monthly payments have been missed".) That motion was not opposed and stay relief was granted in June, 2014 (Docket No. 25).

8. *See* Docket No. 1, Schedule D.

9. *See* Docket No. 59, Line 43(a); *see also* fn. 7.

10. *See* Docket No. 1, Schedule D.

11. *See,* Docket No. 1, Statement of Financial Affairs, Item No. 4.

12. *See* Docket No. 1, Chapter 7 Individual Debtor's *Statement Of Intention,* Part A, Property No. 2.

13. This belief is supported by the property records of Fulton County, Georgia, which show the recording of a deed under power of sale filed by Christiana Trust on behalf of the Debtors regarding the property on June 1, 2015.

ors.[14] By the time of the Hearing, the Debtors had leased a 3 bedroom home in a gated community in Trophy Club for $4,200 a month, their twins (now 24 years old) were in school at Georgia State University, and their third eldest child (now 21 years old) remained at Georgia Perimeter College. In connection with the move, the Debtors left their paid-for cars (a 2005 Chrysler Sebring and 2006 GMC Yukon) with their Atlanta-based children and leased newer used cars (a 2012 Chevy Malibu and a 2010 Mercedes, the latter described by Mrs. Navin as her "dream car"). All the Atlanta-based children were also working part time to provide partial support for themselves. The two youngest children were initially in public schools in Texas, but as of the Hearing Date were being home-schooled by Mrs. Navin.

The Debtors' Schedules listed total assets of $1,021,402, and total liabilities of $1,356,076. All but approximately $40,000 of the Debtors' assets consisted of their home, which now appears to have been foreclosed on. The Debtors' liabilities consisted primarily of their two mortgages ($960,000 and $125,000), the federal tax lien ($164,000), the $5,000 credit card judgment lien, $24,000 owed to the IRS as a priority unsecured claim and $75,000 owed to the State of Maryland.[15] The Debtors also proposed to exempt virtually all of their $40,000 in remaining assets in accordance with Georgia law ($17,000 in 401(k) funds representing the largest part of those exemptions).

There was substantial disagreement during this bankruptcy case over the Debtors' income and expenses. Most of that was resolved for means test purposes as part of the effort of the U.S. Trustee to dismiss the case under Section 707(b)(2). However, for the purposes of determining whether the Debtors have income available to pay creditors in a reorganization case, some disputes remain.

In connection with the Hearing, the Debtors prepared draft Schedules I and J[16] that show a negative $1,100 monthly cash flow, based on Mr. Navin's salary (excluding any bonuses). Ms. Jackson, on behalf of the U.S. Trustee, testified regarding adjustments to that analysis (both to income and to expenses) that the U.S. Trustee believes would be appropriate and that would produce a positive monthly cash flow ranging from $4,300 to $5,500 from Mr. Navin's salary.

On the income adjustments, the most significant adjustment, which appears accurate, is to remove approximately $2,000 a month for state income tax withholding, since as residents of Texas the Debtors would no longer owe any state income tax. The U.S. Trustee also added a car allowance provided to Mr. Navin by his employer, and eliminated Mr. Navin's 401(k) contribution. The former addition appears appropriate. The Court lacks sufficient facts to address the latter matter, and thus declines to make that adjustment in this context. So adjusted, the Debtors have income from Mr. Navin's salary of $14,000 per month.[17]

---

**14.** The Debtors testified at the Hearing that they provide between $1,000 and $2,000 a month in support to these 3 children.

**15.** Not included are any liabilities to Fulton County or the State of Georgia as a result of the currently pending cases filed by each against the Debtors. The nature and amount of these liabilities is not known.

**16.** These draft Schedules were admitted into evidence at the Hearing as U.S. Trustee's Exhibit 7.

**17.** As discussed below, payroll taxes will need to be deducted from these amounts. However, since those amounts vary during the year, they are subtracted later in the analysis.

The Debtors' expenses on their proposed Schedule J total $12,684. The U.S. Trustee adjusted these expenses upward based on the Debtors' deposition testimony to $13,750 per month. The U.S. Trustee then challenged the Debtors' expenses, asserting they are inflated, and that the Debtors should be limited to expenses for housing, living expenses and transportation based on IRS's Bankruptcy Allowable Living Expenses Local Housing and Utilities Standards [18] and the IRS's Local Transportation Expense Standards [19] (collectively, the "*IRS Allowable Expenses Standards*"), citing *In re Talley*, 389 B.R. 741, 744 (Bankr.W.D.Wash.2008) (holding that while not technically applicable, courts have found them to be helpful guidelines), and *In re Kaminski*, 387 B.R. 190, 196 (Bankr.N.D.Ohio 2008). The IRS expenses, plus the Debtors' other expenses, total $9,000, leaving $5,000 per month available to pay creditors under the U.S. Trustee's analysis.

The foregoing figures, however, do not include a subtraction for payroll taxes. Payroll taxes reduce the available amounts by approximate $1,200 per month for the first 6 months of the year, but not thereafter. Consequently, using the Debtors' figures, they are about $950 short per month for the first 6 months, and have approximately $250 per month available in the last 6 months—or a net shortfall of about $4,200 a year. Using the U.S. Trustee's figures, the Debtors have about $3,800 per month available from January to June and $5,000 per month from July–December. None of the foregoing figures includes any of the bonuses that Mr. Navin may earn.

Over a 60–month period (a Chapter 13 plan term or a 5–year payout in a Chapter 11), the Debtors' figures would result in no return to their creditors, and, in fact, would require a modest annual supplement from Mr. Navin's bonus; the U.S. Trustee's figures would result in around $265,000 being available for creditors. Neither of those figures include potential bonuses, which, based on Mr. Navin's prior bonuses, could result in several hundred thousand dollars of additional return over 5 years. On a creditor base (from the Debtors' Schedules) of $1.35 million, the Debtors' figures, without bonuses, would result in no return to creditors; the U.S. Trustee's figures would result in a return of approximately 20%. Adding $200,000 in net bonuses over the 5 years (a figure the Court finds likely to be achieved based on Mr. Navin's bonus history) would raise those returns to 12% and 34%, respectively. If the first mortgage debt is excluded, because that creditor seems to have foreclosed on the Debtors' Georgia residence and has not evidenced any intent to pursue a deficiency (if one exists),[20] the gross claims against the Debtors would fall to around $400,000, and returns would increase to 0% and 66% (without bonuses) and 50% and 100% (with bonuses), respectively.

At the Hearing, the U.S. Trustee presented a substantial amount of evidence

---

**18.** There are different tables depending on what relevant date is being used, and what state the debtor lives in, so as related to these Debtors, the US Trustee used the table for Texas, for a hearing date on or after November 1, 2015. That table is available at https://www.justice.gov/ust/eo/bapcpa/20151101/bci_data/housing_charts/irs_housing_charts_TX.htm

**19.** on what relevant date is being used, and what region the debtor lives in, so as related to these Debtors, the U.S. Trustee used the table for the South Region, for a hearing date on or after November 1, 2015. That table is available at https://www.justice.gov/ust/eo/bapcpa/20151101/bci_data/IRS_Trans_Exp_Stds_SO.htm

**20.** *See* fn. 23

about the spending habits of the Debtors during the calendar year 2015 in an effort to show that the Debtors were spending a lot of money on frivolous and extravagant things, and thus could devote those funds to paying creditors. Unfortunately, those expenditures were made during a year in which the Debtors also indisputably received approximately $50,000 in an inheritance from Mr. Navin's mother, and thus it was not clear whether those same lavish expenditures could have been made (and thus the funds spent on those things potentially redirected to pay creditors) in a year without that additional cash infusion.

### LEGAL ANALYSIS

■ Under 11 U.S.C. § 707(b), the court is required to dismiss a case (or, if the Debtors consent, convert it) if granting relief under Chapter 7 would be "an abuse". The application of the means test as set out in 11 U.S.C. § 707(b)(2) determines whether a rebuttable presumption of abuse arises. If the presumption of abuse does not arise under Section 707(b)(2), or if it is rebutted, the court can nevertheless dismiss a Chapter 7 case for abuse if the bankruptcy petition was filed in bad faith or if the totality of the circumstances of the debtor's financial situation demonstrates abuse. *See* 11 U.S.C. § 707(b)(3). The U.S. Trustee has the burden of proving abuse by a preponderance of the evidence. *In re Beckerman*, 381 B.R. 841, 844 (Bankr.E.D.Mich.2008).

At this point in this case, the U.S. Trustee seeks to have the Debtors' case dismissed under 11 U.S.C. § 707(b)(3), because "the totality of the circumstances . . . of the debtor's financial situation dem-

onstrates abuse."[21] The U.S. Trustee moved to dismiss the Chapter 7 case as an abusive filing, arguing that the Debtors could make substantial payments to creditors in a Chapter 11 or 13 case or outside of bankruptcy. The U.S. Trustee urges that the Debtors could make material payments on their unsecured debts, and that if they changed their lifestyle by reducing or eliminating certain expenses, including their housing costs and the costs of supporting their adult children, they could free up additional funds with which to make payments on unsecured debt.

■ In analyzing whether the "totality of the circumstances" of the Debtors' financial situation demonstrates abuse, courts have over time produced the following list of factors to be considered:

(i) Whether the bankruptcy filing was precipitated by an unforeseen catastrophic event such as a sudden illness or unemployment;

(ii) Whether the debtor is eligible for chapter 13 relief;

(iii) Whether there are non-bankruptcy remedies available to the debtor;

(iv) Whether the debtor can obtain relief through private negotiations;

(v) Whether the debtors' [sic] proposed budget is excessive or unreasonable;

(vi) Whether the debtor has a stable source of future income;

(vii) Whether the debtors [sic] could provide a meaningful distribution in a chapter 13 case; and

(viii) Whether the debtors' [sic] expenses could be reduced significantly without depriving them and their dependents of necessities.

---

**21.** As noted earlier, The U.S. Trustee initially asserted in this matter that the Debtors also failed the "means test." That issue was previously determined in favor of the Debtors, such that dismissal under Section 707(b)(3) is the only issue remaining in this contested matter. The U.S. Trustee does not assert that the case was filed in bad faith, and no evidence was presented to suggest that it was.

*In re Walker,* 383 B.R. 830, 837 (Bankr. N.D.Ga.2008).

To the extent the answers to these questions (other than (i)) are "yes", the factors point to a conclusion of "abuse", since they suggest alternatives to a Chapter 7 filing. Many courts hold that the debtor's ability to pay a significant portion of his or her debts, either in or outside of a bankruptcy case, is the most significant fact. *In re Lavin,* 424 B.R. 558, 563 (Bankr.M.D.Fla. 2010); *In re Mauer,* 2009 WL 2461380, at *4 (Bankr.N.D.Ohio 2009); *In re Norwood-Hill,* 403 B.R. 905, 912 (Bankr. M.D.Fla.2009); *In re Freis,* 2007 WL 1577752, at *2 (Bankr.W.D.Mo.2007).

 However, the courts also generally hold that an ability to pay alone is not sufficient to justify dismissal of a case for abuse. *In re Crink,* 402 B.R. 159, 173 (Bankr.M.D.N.C.2009); *In re Cribbs,* 387 B.R. 324, 334 (Bankr.S.D.Ga.2008); *In re Johnson,* 318 B.R. 907, 918 (Bankr.N.D.Ga. 2005). As the court in *In re Nockerts,* 357 B.R. 497 (Bankr.E.D.Wisc.2006) noted, "To apply the means test, dislike the result, and then examine the debtor's ability to fund a chapter 13 plan under § 707(b)(3), renders the means test 'surplusage.'" *Id.* at 506. The language of Section 707(b)(3), "suggests that an inquiry into a debtor's financial situation requires an inquiry into *more than* what is tested in the means test." (*emphasis in original*). *Id.* at 507. In short, the totality of the circumstances means *totality* and not just ability to pay. With this background, the Court will examine each of the factors as they apply to Mr. and Mrs. Navin.

### 1. *Bankruptcy Caused by Unforeseen Event*

The evidence established that the bankruptcy filing was not precipitated by a single unforeseen catastrophic event, such as a sudden illness or unemployment. The bankruptcy filing was instead precipitated by a combination of events that occurred over almost a decade, including the failure of the Debtors to pay taxes on a $450,000 bonus received by Mr. Navin in 2006, the purchase by the Debtors of an expensive home right before the recession that began in 2007, the illness commencing in 2009–2011 of the mothers of both Debtors, and the Debtors' children reaching college age starting in 2010. Some of these events were unforeseen; others should not have been. None of these events began during the two (2) years immediately preceding the bankruptcy filing. On balance, the Court does not believe that the bankruptcy was precipitated by unforeseen factors, and certainly was not based on any sudden event, so this factor points towards abuse.

### 2. *Eligibility For Repayment-Based Relief*

The parties appear to agree that the Debtors were not eligible for Chapter 13 relief when they filed this case.[22] However, they would have been eligible for Chapter 11. Eligibility for Chapter 11 has also been held to satisfy this criterion. *In re Truax,* 446 B.R. 638, 642 (Bankr.S.D.Ga.2010)(citing cases). Further, if the lender on the Debtors' Georgia home has not confirmed the foreclosure sale under Georgia law, which all available

---

**22.** The parties' apparent agreement on this point notwithstanding, the Debtors' scheduled debts, secured and unsecured, totaled only $1,353,000. If the home was worth its scheduled value of $980,000 (and the Court has not been presented with competent evidence suggesting some other value), and all of the other assets of the Debtors were exempt, then the Debtors would have secured claims of $980,000, and unsecured claims of approximately $370,000, and they would have been eligible Chapter 13 debtors. *See* 11 USC § 109(e) (limits are $1,149,525 in secured debt and $383,175 in unsecured debt).

evidence suggests is the case,[23] then it is barred from seeking a deficiency against the Debtors. As a result, the roughly $960,000 in claims associated with that home are no longer relevant, and the Debtors are eligible for Chapter 13 relief now.[24] Thus, the second factor points to a determination of abuse.

### 3. Out-of-Court Remedies and Negotiations

The Debtors made some efforts to obtain relief through private negotiations. The Debtors testified they attempted out-of-court workouts with the IRS prior to the Petition Date, making bi-weekly payments at some time, but ultimately these efforts were unsuccessful. The State of Maryland was apparently less flexible than the IRS. The Debtors testified they also made some effort to restructure their first mortgage, particularly seeking to reduce the above-market interest rate, but the bank would not renegotiate the loan in light of Mr. Navin's income. They also negotiated with Old Republic, the second mortgage lender, but it wanted a discounted lump sum that they could not satisfy. These two factors point to a lack of abuse.

### 4. Reliable Income

Mr. Navin has stable employment and a good salary. He has been employed in executive positions in the beverage industry for more than a decade. His salary is already $220,000 a year, and he testified that he expected a raise in his salary in 2016. He is also eligible for a performance-based bonus, received bonuses of around $90,000 (gross) in 2012 and 2013, and around $40,000 (net) in 2014, and expects a bonus for 2015 as well. Thus, Mr. Navin has a significant, stable income in the form of the base salary, with bonus potential that seems reliable but less certain in amount. In view of the certainty of Mr. Navin's income and his potential for a substantial annual bonus, this factor points to abuse.

### 5. Chapter 13 Distribution

As noted above, it appears that in almost any likely circumstance, the Debtors could make a meaningful distribution to creditors. The only scenario that does not produce such a distribution is if all of the Debtors' expenses are accepted, and Mr. Navin receives no bonuses in the next 5 years. As outlined below, the Court does not believe that all of the Debtors' expenses are justified, and it believes that significant annual bonuses are very likely for Mr. Navin. The Court believes that, based on Mr. Navin's employment history, a rising salary and a significant bonus are likely components of each year's compensation for him. When those are considered, the Debtors could provide a dividend to creditors of at least 12%, and likely much more. Further, based on the evidence provided, the Court believes that the Debtors' first mortgage lender has foreclosed on their Georgia home, and that it has not taken the steps necessary to pursue a deficiency in connection with that foreclosure. In that case, the first mortgage claim would go away altogether, the remaining claims in the case would be closer to $400,000, and, with just the bo-

---

**23.** The Debtors testified that they had not been served with any pleadings commencing a confirmation action under applicable Georgia law. See O.C.G.A. § 44-14-161 (barring pursuit of a deficiency if a confirmation action is not filed within 30 days of foreclosure).

**24.** If the Debtors were indeed ineligible for Chapter 13 on the Filing Date, they may need to allow this case to be dismissed and file a new Chapter 13 case to pursue Chapter 13 relief, since eligibility appears to be assessed on the filing date. See In re Grew, 278 B.R. 619, 622 (Bankr.M.D.Fla.2002).

nuses going to creditors, the return to creditors would be at least 50%, and could result in payment in full. This factor suggests abuse.

### 6. *Reasonableness of Debtors' Budget*

The final factor for consideration is whether the Debtors' budget is reasonable. In that regard, the Court finds some of the Debtors' expenditures to be excessive. First and foremost, they are spending $4,200 per month renting a house. They had previously proposed to rent a house in Georgia for a similar price, trying to stay in high-priced Milton rather than moving to a less expensive area, ostensibly to keep their children in the same public schools that they had been attending. This argument may have been plausible had they stayed in Georgia. When they moved to Texas, however, they again claimed to be unable to locate an acceptable house for less than $4,000 per month. They chose the Trophy Club house for its proximity to the airport, and for the schools, but shortly thereafter pulled the children out of the schools and are home-schooling them.

The U.S. Trustee proposed an allowance for housing of $1,708 from the IRS Allowable Expenses Standards. Although the Court believes that the Debtors could likely arrange for lodgings that cost less than $4,200 per month, the Court is also somewhat skeptical that the Debtors could secure adequate housing at the IRS figure. The Court was not presented with any evidence regarding any specific alternative housing ·that the Debtors could have secured, and the Court is aware, as pointed out by the Debtors, that securing housing in light of their pending Chapter 7 and evident financial difficulties was not an easy endeavor. Nevertheless, the Court believes that the Debtors could, and should, secure less expensive housing, and

that as much as $1,000 a month could be saved by doing so.

Next is the issue of their support of their older children. It is fairly well established in these circumstances that debtors are not entitled to provide support to their adult children in lieu of providing funds to their creditors. *See In re Walker*, 383 B.R. at 838. This would reduce the Debtors' monthly expenses by around $1,000, the amount of support the Debtors currently budget to provide to their 3 adult children.

Other expenses claimed by the Debtors also appear to be excessive. Their claim of $700 per month for gas and electricity does not appear to be supported by either their 2015 bills at their house in Georgia or the first few bills from their new utilities in Texas (as evidenced by the amounts paid from their bank accounts). Gas and electricity appear to be overstated, collectively, by at least $200 per month. In addition, it is not clear that the Debtors should be permitted a deduction of over $1,000 a month for two car payments, particularly when the need for the payments arose from the Debtors having given their two existing, debt-free cars to their college-aged children. A reduction in this expense would also likely be appropriate.

### CONCLUSION

When the Court evaluates the totality of the circumstances of the financial condition of the Debtors, the Court **FINDS** the filing of the Chapter 7 petition is an abuse under 11 U.S.C. § 707(b)(3) and **GRANTS** the Motion.

**IT IS ORDERED.**